LAKE COUNTY TITLE COMPANY A DIVISION OF
CHICAGO TITLE INSURANCE COMPANY v.
ROOT ENTERPRISES, INC.

[No. 3-274A28. Filed December 31, 1975. Rehearing denied
January 27, 1976. Transfer denied August 20, 1976.]

562

Edmond J. Leeney, Patrick J. Galvin, Galvin, Galvin & Leeney, of counsel, of Hammond, for appellant.

Glenn T. Tabor, Duane W. Hartman, Blachly, Tabor, Bozik & Hartman, of Valparaiso, for appellee.

STATON, P.J.—Root Enterprises, Inc. deposited in escrow $35,000.00 with the Lake County Title Company. This deposit was for the construction of a building that Root had agreed to lease to Truck Owners and Operators National Association, Inc. (Toona). The lease agreement provided that Toona was to contract for the construction and pay any construction cost over $35,000.00. Toona's general contractor, Planned Construction, Inc., left the construction site in late May 1969 after a dispute. The building was almost completed, but many subcontractors had not been paid. Root paid various subcontractors more than $20,000.00 in addition to $30,000.00 that had been disbursed to Planned Construction, Inc. out of the escrow account. Root brought this action against the Title Company, since Title Company had made payments out of escrow in violation of the escrow agreement. Root received a judgment for $15,419.04, and the Title Company brings this appeal which raises these issues for our review:

(1) Was a second motion to correct errors required to perfect the Title Company's appeal?

(2) Was the trial court's judgment contrary to law?

(3) Was the evidence sufficient to support the trial court's findings?

Our opinion concludes that the Title Company properly perfected its appeal when it filed a second motion to correct errors. It further concludes that an error of law was made as to part of the judgment rendered by the trial court and that the evidence was not sufficient to support some of the trial court's findings. The trial court's judgment is reversed in part and affirmed in part.

I.

*Perfecting Appeal*

On August 31, 1972, the trial court adopted special findings of fact and conclusions of law when it entered judgment for Root in the sum of $20,394.04. On October 30, 1972, the Title Company timely filed a motion to correct errors. On August 31, 1973, the trial court granted in part the Title Company's motion to correct errors by reducing the original

judgment to $15,419.04. This reduction was apparently a credit for $4,975.00 which Title Company as an escrow agent had returned to Root. The August 31, 1973, entry was as follows:

"The Court having heard the arguments of counsel and the Court having examined the briefs submitted by counsel, all in connection with defendant's motion to correct errors, now grants defendant's motion to correct errors in the following particulars, to-wit:

"1. That the original judgment entered herein in the amount of $20,394.04 should be reduced to $15,419.04, and the same is hereby so reduced; and,

"2. That the title of the pleading signed by this Court on August 31, 1972, which reads as follows,

'The Court, at the request of the Defendant, Makes the following Findings of Fact' is hereby stricken and in its place, the following title is inserted:

'Findings of Fact and Conclusions of law;'

and overrules defendant's motion to correct errors in all other respects.

"Judgment accordingly."

In ruling on Title Company's first motion to correct errors, the trial court entered no new findings of fact or conclusions of law.

On October 24, 1973, Title Company filed a second motion to correct errors addressed to the judgment entered on August 31, 1973. This motion was overruled on November 19, 1973. Title Company filed the praecipe for transcript of the record on November 26, 1973, and filed the record in this Court on February 15, 1974.

Root contends that the praecipe and the record were not timely filed and that the appeal should be dismissed. The question is whether the second motion to correct errors was required. If the second motion was required, then the praecipe and the record were timely filed after the court's ruling on this second motion. If the second motion was not required, then the praecipe and the record were not timely filed after the court's ruling on the first motion to correct errors.

We have examined the cases which purport to guide lawyers in determining when a second motion to correct errors is required to perfect an appeal to this Court. Consistently, the appellate tribunals have dismissed appeals because a second motion to correct errors was not filed. *See State* v. *Deprez* (1973), 260 Ind. 413, 296 N.E.2d 120; *Davis* v. *Davis* (1974), 159 Ind. App. 290, 306 N.E.2d 377; *Wyss* v. *Wyss* (1974), 160 Ind. App. 281, 311 N.E.2d 621; *State* v. *Kushner* (1974), 160 Ind. App. 464, 312 N.E.2d 523; *Koziol* v. *Lake County Plan Comm'n* (1974), 161 Ind. App. 232, 315 N.E.2d 374; *Weber* v. *Penn-Harris-Madison School Corp.* (1974), 162 Ind. App. 28, 317 N.E.2d 811; *Hansbrough* v. *Indiana Revenue Bd.* (1975), 164 Ind. App. 56, 326 N.E.2d 599. In each of the above cases, the trial court, in ruling on the first motion to correct errors, either expressly vacated its earlier judgment or made new or additional findings of fact or conclusions of law and entered a new judgment. It might be contended that the present case is distinguishable from these cases because in the present case the first judgment was not expressly vacated and no new or additional findings of fact or conclusions of law were entered when the judgment was modified.

Nonetheless, in the above cases, the rule is stated more broadly than the facts of each case required. In *Davis* v. *Davis, supra,* 306 N.E.2d at 380, the court said:

> "[I]f a trial court grants or denies a motion to correct errors which is accompanied by a new entry or judgment consisting of additional findings, amendments, *or other alterations* of the prior judgment, the party aggrieved thereby must file a motion to correct errors addressed to the new entry which has become the final judgment from which appeal is taken." (emphasis added).[1]

In *Weber* v. *Penn-Harris-Madison School Corp., supra,* 317 N.E.2d at 813, the court stated:

> "This Court reads *Deprez* to mean that if the trial court, in ruling on the motion to correct errors, does anything

---

1. In *Weber* v. *Penn-Harris-Madison School Corp., supra,* the argument that a party is not "aggrieved" by a judgment which is amended in its favor was dispensed with.

other than simply granting or denying the motion, that ruling becomes a new judgment to which a new motion to correct errors must be directed. Therefore, *any amendment of a judgment creates a new judgment which requires a motion to correct errors.*" (emphasis added).

In granting in part Title Company's motion to correct errors, the trial court entered a new judgment against Title Company for $15,419.04. The previous judgment for $20,394.04 was no longer of any effect. Title Company filed a second motion to correct errors addressed to the last judgment entered. We conclude that, if the guiding cases are read to me na w thhayet tyaies,Tl cases are read to mean what they say, Title Company correctly filed a second motion to correct errors. The original judgment was amended, and we have held that "any amendment of a judgment creates a new judgment which requires a second motion to correct errors."[2]

We conclude that the second motion to correct errors was necessary to perfect this appeal.

---

2. In *State* v. *Deprez, supra,* 260 Ind. at 420, 296 N.E.2d at 124, the Supreme Court stated: "If the trial court had simply either granted or denied that Motion to Correct Errors such step would have constituted the final judgment from which this appeal could have been taken without further ado." Similar statements were made in cases following *Deprez.* In *Easley* v. *Williams* (1974), 161 Ind. App. 24, 314 N.E.2d 105, the Appellate Court held that the trial court "simply granted" plaintiff's motion to correct errors when it abolished the original judgment, granted a new trial, and entered no new judgment. In *Easley,* the granting of the new trial was the "final judgment from which [the] appeal could have been taken without further ado." In *Easley,* the Court distinguished the cases of *State* v. *Deprez, supra; Davis* v. *Davis, supra; Wyss* v. *Wyss, supra;* and *State* v. *Kushner, supra:*

"All of these previously discussed cases differ from the case now before us in that in each of those earlier cases, a new judgment resulted from the trial court's ruling on the original Motion to Correct Errors. However in this case, the court's ruling on the Motion to Correct Errors abolished the original judgment by granting a new trial, and no new judgment resulted. Therefore, no subsequent Motion to Correct Errors was required." 314 N.E.2d at 108.

In the present case, a new judgment was entered on August 31, 1973, when the court granted Title Company's first motion to correct errors. The oft-stated purpose of the motion to correct errors requirement is to afford the trial court an opportunity to correct the alleged error. *Indiana State Personnel Bd.* v. *Wilson* (1971), 256 Ind. 674, 271 N.E.2d 448; *Davis* v. *Davis, supra.* This opportunity was afforded the trial court in this case, and the purpose of the motion was accomplished.

## II.

### Escrow Agreement

Root was the owner of certain real estate in Lake County, Indiana. On August 28, 1968, Root, as Lessor, and Truck Owners and Operators National Association, Inc. (Toona), as Lessee, entered into an agreement entitled "Lease of Land With Building To Be Erected." Pursuant to this lease agreement, Toona agreed to build a building on Root's land at a cost to Root of $35,000.00. Toona was to absorb any cost in excess of that price. The lease agreement provided that Root was to pay the sum of $35,000.00 to an escrow agent. The Title Company was designated as the escrow agent, and it accepted the duties set out in the lease agreement, which were enumerated as follows:

(A) "[T]he escrow agent shall pay Lessee or designee the following sums at the following times upon the certificate of Lessee:

 (1) Ten thousand dollars ($10,000.00) upon the completion of the foundation;

 (2) Ten thousand dollars ($10,000.00) upon the completion of the roof;

 (3) Ten thousand dollars ($10,000.00) upon substantial completion of the building ready for occupancy;

 (4) The balance of five thousand dollars ($5,000.00) upon full and final completion of the building and presentation to the escrow agent of an executed release of liens or copies of receipts from all contractors showing payment in full for the finished construction."

(B) "The escrow agent shall obtain partial waiver of lien agreements on each pay out as provided for above."

(C) "At the time of the first pay out, the lessee shall furnish an affidavit showing all of the contractors hired for the building program and the contract price payable to each of them."

Toona designated Planned Construction, Inc. (PCI) to be in charge of construction of the building, and all payments

were to be made to PCI as designee. Title Company, as escrow agent, issued checks as follows:

$10,000.00 to PCI on January 20, 1969

$10,000.00 to PCI on March 21, 1969

$10,000.00 to PCI on May 20, 1969

$4,975.00 to Root on September 16, 1969, upon Root's demand. (This amount represented the balance of $5,000.00 less a $25.00 escrow fee retained by Lake County Title Co.)

Title Company issued the first three checks to PCI totaling $30,000.00 without ever having received a Lessee's certificate and without ever having received a signed affidavit showing all contractors and the contract price payable to each.[3] Title Company issued the first and second checks without having received any partial or final lien waivers. When Title Company issued the third check, only the following lien waivers had been received:

(1) Larry Child Excavating—final waiver dated 3/13/69;

(2) Andy's Sheet Metal Co.—final waiver dated 5/8/69;

(3) Beverly Metal Products, Inc.—partial waiver of sum of $1,000.00 dated 5/8/69;

(4) Emil Roofing Co., Inc.—partial waiver of sum of $1,000.00 dated 5/8/69;

(5) M. J. Sum Construction Co.—partial waiver of sum of $1,800.00 dated 5/8/69.

Title Company never received any other waivers.

PCI did not use all the funds disbursed to it to pay the subcontractors. Because of a disagreement with Toona, PCI

---

3. Title Company did receive at least one list, unsigned and undated, from PCI's construction supervisor, showing various contractors, contract prices, and amounts paid. Since amounts paid were noted on the list and since the testimony reveals that no monies were paid to subcontractors until the first $10,000.00 was disbursed to PCI, it appears that this list was not received prior to the first payout of funds. This list appears to have been substantially accurate—all but one of the contractors involved in the pre-completion construction were named, and the balances due these contractors corresponded to the amounts the evidence showed were due them. Those contractors not included on the list were the same as those stipulated by the parties to have been paid to complete work on the building.

refused to complete the construction late in May 1969, which was after $30,000.00 had been disbursed by the Title Company. PCI's man on the job testified that only the sign and the blacktopping remained to be completed when he left. Root's president testified that the job was not complete when PCI left, but some workmen remained or were called back to work on the building.

In June 1969, Root began to receive notices of intent to hold mechanics' liens from various subcontractors. In September 1969, after Toona had defaulted on the lease,[4] Root demanded the balance of $5,000.00 from Title Company, which was returned less a $25.00 escrow fee. Root paid more than $20,000.00 to workmen who had filed liens and workmen who worked to complete the building. Later Root instituted this action to recover from Title Company the damages incurred as a result of Title Company's breach of its contractual commitment to obtain lien waivers, to obtain lessee's certificates, and to obtain the affidavit of contractors and their contract prices.

## III.

### Law and Evidence

The Title Company does not dispute the trial court's conclusion that payment totaling $30,000.00 were made out of escrow to PCI in violation of the escrow agreement. It does contend that the trial court made erroneous conclusions of law and that the trial court's findings are not supported by sufficient evidence when the law is properly applied.

"Where property deposited in escrow is delivered or disposed of without compliance with the conditions of the deposit, the depositer is entitled to recover such damages as he may suffer through the depositary's unwarranted act, . . . but recovery must be limited to the damages

4. When PCI left the job, Toona apparently recognized its obligation to clear the liens, complete the construction, and occupy the building pursuant to the lease agreement. By September 1969, however, Toona had made no lease payments, and Root notified Toona that because of Toona's default Root considered the lease terminated.

actually attributable to the wrongful delivery, and it must be shown that there is a causal relationship between the depositary's noncompliance with his instructions and the loss." 30A C.J.S. *Escrows* § 11, at 1004-05 (1965) (footnotes omitted).

The burden of proof was on Root to establish the causal relationship between its loss and Title Company's breach of the escrow agreement. *Roder* v. *Niles* (1916), 61 Ind. App. 4, 111 N.E. 340. Title Company contends that Root prove only that it paid various sums of money to various people, but it did not prove that these sums were paid under a legal obligation incurred as a result of Title Company's breach of the escrow agreement; thus, the damages are not supported by the law or by the evidence.

When the error complained of is the sufficiency of the evidence to support the findings and conclusions of the trial court, this Court will not weigh the evidence or resolve the credibility of the witnesses. We will look only to the evidence and the reasonable inferences therefrom which tend to support the action of the trial court. *Cole Real Estate Corp. v. Peoples Bank & Trust Co.* (1974), 160 Ind. App. 88, 310 N.E.2d 275; *Wilson* v. *Jerry Miller, Inc.* (1973), 157 Ind. App. 135, 299 N.E.2d 177. It is the duty of the trier of fact to resolve conflicts in the evidence. If there is evidence to support the findings and conclusions of the trier of fact, the judgment will not be disturbed on appeal. *Cole Real Estate Corp., supra.*

When the error complained of is the correctness of the trial court's application of the law, this Court must correctly apply the law to the findings of the trial court and the evidence.

## IV.

### Damage Findings

The trial court made numerous special findings of fact and conclusions of law. We have set out in full the following

because it provides a framework for our discussion of the damage issue:[5]

"8. That as a result of the defendant's [Title Company's] breach of the terms and conditions of the escrow agreement, the plaintiff [Root] was damaged as a result of its making payments in the following manner and in the following amounts:

"a. Payment of valid claims by virtue of valid mechanic's liens having been filed:

| | | |
|---|---|---:|
| 1) | A & B Concrete in the sum of | $2,022.00 |
| 2) | Zarko Sekerez (by stipulation) | 108.00 |
| 3) | Beverly Metal in the sum of | 2,317.14 |
| 4) | Airtite, Inc. in the sum of | 576.00 |
| 5) | Hobart Plumbing & Heating | 2,459.00 |
| 6) | Overhead Door in the sum of | 269.10 |
| | TOTAL | $7,751.24 |

"b. Payment owed to the following by virtue of making the payment within sixty (60) days from the date that the last of the supplies, materials and labor was furnished in order to prevent the filing of mechanic's liens, but without a mechanic's lien having actually been filed.
1) Lake County Glass in the sum of _____$ 915.00

"c. Payout of monies for the completion of the building:

| | | |
|---|---|---:|
| 1) | Edon Electric | $1,000.00 |
| 2) | Edon Electric | 2,200.00 |
| 3) | Ronald Wells | 649.00 |
| 4) | Emil Roofing | 195.00 |
| 5) | B & E Sewer | 798.00 |
| 6) | Portage Paving | 1,800.00 |
| | TOTAL | $6,642.00 |

"d. Payment of monies due under the theory of plaintiff's mitigating damages and under the theory that the defendant would have had to pay the money by virtue

---

5. The total of all the items listed in 8(a), (b), (c), and (d) is $21,393.24. There is no explanation for the difference between this total and the trial court's original judgment of $20,394.04. The only way, however, to formulate a coherent discussion of this case is to work from finding 8, which summarizes all the trial court's findings of fact and conclusions of law.

of the legal doctrine of quantum meriut [*sic*] where the evidence showed medhanic's [*sic*] liens were filed, but the preparation of the liens did not totally comply with statutory requirements:

1)   Zweig Roofing _____$2,550.00
2)   Martin J. Summ Construction _____ 1,951.00
3)   B & B Masonry _____ 1,584.00

    TOTAL _____$6,085.00"

From our examination of the record in the light most favorable to appellee Root, we conclude that 8(a)(3), (4), (5), (6), 8(b), and 8(c) are not supported by the evidence and the reasonable inferences therefrom.[6] Additionally, we conclude that 8(d) is contrary to the law.

## A.

### *Payment to Complete Construction*

In 8(c), the trial court found that "as a result of the defendant's breach of the terms and conditions of the escrow agreement, the plaintiff was damaged as a result of its making payments . . . of monies for the completion of the building." It is true that the parties stipulated that items 8(c)(1), (3), (4), and (5) were paid "to complete work on the building." The evidence reveals that the paying, item 8(c)(6), was not com-

---

6.· There is no evidence of any loss occasioned by Title Company's failure to obtain an affidavit showing contractors hired and contract prices payable to each. The only possible suggestion of damage is the fact that, in some instances, Root could not prove the contract price and, thus, could not prove that the amounts paid to some subcontractors were within the original $35,000.00 cost and were not extras for which lessee Toona was responsible. There is testimony to the effect that all the amounts paid the subcontractors were within the $35,000.00 figure. It has been stated that, "Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty." C. McCORMICK, HANDBOOK OF THE LAW OF DAMAGES § 27, at 101 (1935). The trial court did not consider Title Company's contentions that Root failed to prove the contract prices and thus failed to establish that the responsibility to pay the subcontractors was not Toona's responsibility. We, too, will not consider Title Company's contentions of failure of proof of the contract prices, since the difficulty of proof of the contract prices was caused by Title Company's breach.

pleted when PCI left the job, but there is no evidence that this work was done or that this amount was actually paid to anyone. The evidence shows that item 8(c)(2) was paid for work done prior to the time PCI left, but was paid to induce Edon Electric to complete the work which was the subject of the payment of item 8(c)(1). However, there is no evidence to support a finding that any of this work was incomplete due to Title Company's failure to obtain lessee's certificates and lien waivers. There is no evidence to support a finding that the building was not completed "substantially ready for occupancy" at the time Title Company disbursed the third $10,000.00 check to PCI.

It might be surmised that some of the subcontractors listed in 8(c) were paid for work that should have been done to make the building "substantially ready for occupancy." But this Court has held that "judgments cannot rest upon mere guess, conjecture, surmise, possibility or speculation." *Beaman* v. *Hedrick* (1970), 146 Ind. App. 404, 406, 255 N.E.2d 828, 829; *Hunnicutt* v. *Boughner* (1967), 141 Ind. App. 669, 231 N.E.2d 159. The evidence must be adequate to support a conclusion in the minds of reasonable persons. No reasonable person, considering the evidence presented, could do more than conjecture that the amounts listed in 8(c) were paid to complete work that should have been completed prior to the first, second, or third payouts of funds to PCI and that the monies were paid as a result of Title Company's failure to obtain lien waivers or certificates of the lessee.

Further, there is no evidence that the work would have been completed had the escrow agent received the lessee's certificates or lien waivers. Title Company, as escrow agent, was not a performance bondsman. Title Company was not obligated in any way to be responsible for the legal or factual accuracy of the documents it was to receive. It was not required to view the premises to be certain that the construction was progressing according to schedule before making disbursements.

We conclude that there is no evidence to support the trial court's finding that the amounts paid to the subcontractors listed in 8(c) to complete the building were paid as a result of Title Company's breach of the escrow agreement. We find no other theory upon which the trial court's conclusion of liability for these amounts can be sustained.[7] Therefore, the damages award is, to this extent, erroneous and unsupported by the evidence.

### B.

#### Failure to Obtain Lien Waivers

Items 8(a), 8(b), and 8(d) relate to the damage caused by Title Company's failure to obtain lien waivers from the subcontractors.[8] The trial court concluded that the validity or invalidity of the notices of intent to hold mechanics' liens was immaterial. This is an incorrect statement of the law.

When a contractor waives his right to a lien, he agrees not to rely on the statutory remedy, but to rely only on his common law remedies against the owner of the property. *Hammond Hotel & Improvement Co.* v. *Williams* (1931), 95 Ind. App. 506, 176 N.E. 154, 178 N.E. 177. In the present case, the subcontractors would

7. No liens were filed by any of the subcontractors listed in 8(c). There is no evidence showing when the last work was completed by these subcontractors, and thus there is no evidence that any of these amounts were paid within sixty days of completion of the work. Unless a valid lien was filed or payment was made within the time for filing a valid lien, the trial court's conclusion of liability cannot be sustained on the basis that the damage was caused by Title Company's failure to obtain lien waivers. This is the only other theory on which the conclusion of liability could be based.

8. On the back of each check issued to PCI, above the endorsement, a form of lien waiver by the contractor PCI was printed. Since Title Company agrees that it failed to obtain lien waivers, it is obvious that the parties intended that the waivers be obtained from the subcontractors and that the waiver signed by the general contractor was not sufficient compliance with the terms of the contract between Root and Title Company.

As noted above, there is no evidence that the building was not completed "substantially ready for occupancy" at the time of the payout of the third $10,000.00 check to PCI. See section IV A *supra*. Thus, damages awarded Root for payments to the subcontractors listed in 8(a), 8(b), and 8(d) cannot be supported on the theory that Root's "loss" was causally connected to Title Company's failure to obtain certificates of completion before the payout of escrow funds to PCI.

have had no common law action against owner Root if they had waived their statutory rights to mechanics' liens. Although we find no Indiana cases directly on point,[9] an examination of the law in other jurisdictions reveals the general rule:

> "[A] subcontractor who furnishes material or labor pursuant to an agreement with, or upon the order and credit of a general contractor cannot recover against the property owner upon the basis of an implied promise to pay arising from the owner's receipt and acceptance of the benefit of the material and labor furnished. Thus it is said that a landowner will not be held liable for work or material furnished by a subcontractor to a contractor, pursuant to a contractual arrangement between the contractor and the subcontractor, where the landowner is not a party to this contractual arrangement." *Dale's Service Co.* v. *Jones* (1975), 96 Idaho 662, 534 P.2d 1102, 1106 (footnotes omitted).

The rule is stated in 98 C.J.S. *Work & Labor* § 13, at 737 (1957), as follows:[10]

> "If the owner of property employs another to procure work to be done thereon, to whom the workmen engage themselves and on whose credit they perform the work, the obligation to pay rests on the person to whom the credit is given; and a furnisher of materials who makes an agreement with a contractor has no action against the owner of the property in which such material is used, who has paid the contractor. . . ."

9. We are referred by Root to the case of *Everroad* v. *Schwartzkopf* (1890), 123 Ind. 35, 23 N.E. 969, in which the Court held that:

"Where one has entered into a special contract to perform work for another, and has done the work, but not in the time or manner stipulated in the contract, if the work done is accepted and used by the other party, the latter is answerable to the amount he is benefited upon an implied promise to pay for the value he has received."

The distinguishing feature is that in *Everroad* there was a contract between the parties, while in the present case there was no contract, express or implied, between the owner Root and the subcontractors.

10. See also *Chatfield* v. *Fish* (1940), 126 Conn. 712, 10 A.2d 754; *Cohen* v. *Delmar Drive-In Theatre, Inc.* (1951), 46 Del. 427, 84 A.2d 597; *Custer Builders, Inc.* v. *Quaker Heritage, Inc.* (1973), 41 App. Div.2d 448, 344 N.Y.S.2d 606; *Johnson* v. *Kidd* (1963), 108 Ga.App. 53, 131 S.E. 2d 861; *Johnson & Peterson, Inc.* v. *Toohey* (1969), 285 Minn. 181, 172 N.W.2d 326; *Lundstrom Constr. Co.* v. *Dygert* (1959), 254 Minn. 224, 94 N.W.2d 527; 13 AM.JUR. *Building & Construction Contracts* § 29 (1964); 98 C.J.S. *Work & Labor* §§ 10, 13, 42 (1957); contra *Paschall's Inc.* v. *Dozier* (1966), 219 Tenn. 45, 407 S.W.2d 150.

Owner Root agreed with lessee Toona that Toona would be in charge of construction of the building at a fixed cost to Root. Toona employed PCI to procure the work to be done on the property. The workmen listed in 8(a), 8(b), and 8(d) apparently engaged themselves to PCI, and performed the work on PCI's credit. These subcontractors and Root entered into no contract. Root paid the contractor, PCI. Thus, these subcontractors had no action against owner Root on the common law theory of quantum meruit.[11] Only if these subcontractors filed valid mechanics' liens against Root's property could they hold Root liable for amounts due them. Otherwise, Root was not legally or contractually obligated to pay them.

Clearly, the damage caused Root by Title Company's failure to obtain lien waivers includes all amounts paid to discharge valid liens filed as a result of Title Company's failure to obtain waivers before disbursing the $30,000.00 to PCI. Damages do not include amounts paid by Root as a volunteer. Since mechanics' lien statutes are in derogation of the common law, they must be strictly construed. Subcontractors seeking lien protection must strictly comply with the statutory filing requirements. *See, e.g., Menzenberger* v. *American State Bank, Inc.* (1935), 101 Ind. App. 600, 198 N.E. 819. IC 1971, 32-8-3-3 (Burns Code Ed.) contains the filing requirements:

"Any person who wishes to acquire a lien upon any property, whether his claim be due or not, shall file in the recorder's office of the county, at any time within sixty [60] days after performing such labor or furnishing such materials, or machinery, described in section 1 [32-8-3-1] of this act, a sworn statement in duplicate of his intention to hold a lien upon such property for the amount of his claim, specifically setting forth the amount claimed, the

---

11. We note that, if these subcontractors had engaged themselves to perform work for Root, Root would have been liable to them on a theory of quantum meruit for benefits received, and we would find no proof of damage attributable to Title Company's failure to obtain lien waivers. Root would have been liable, whether or not Title Company obtained lien waivers, to the extent that the amounts due were the reasonable value of the benefits received.

name and address of the claimant and the name of the owner, and shall give legal description, street and number, if any, of such lot or land on which the house, mill, manufactory or other buildings, bridge, reservoir, system of waterworks or other structure may stand or be connected with or to which it may be removed. The name of the owner and legal description of such lot or land will be sufficient if they are substantially as set forth in the latest entry in the county auditor's transfer books at the time of filing of the notice of intention to hold a lien. . . ."[12]

Even though the trial court concluded that the validity or invalidity of the mechanics' liens was immaterial, the court, in its special findings of fact and conclusions of law, set out its findings as to the validity or invalidity of the liens filed. This Court must correctly apply the law to these findings.

In 8(d), the trial court found that mechanics' liens were filed, but the liens did not totally comply with the statutory

---

12. IC 1971, 32-8-3-1 (Burns Code Ed.), referred to in the quoted section, provides in part:

"Contractors, subcontractors, mechanics, lessors leasing construction and other equipment and tools, whether or not an operator is also provided by the lessor, journeymen, laborers and all other persons performing labor or furnishing materials or machinery, including the leasing of equipment or tools used, for the erection, altering, repairing or removing any house, mill, manufactory, or other building, bridge, reservoir, systems of waterworks, or other structures, or for construction, altering, repairing, or removing any walk or sidewalk, whether such walk or sidewalk be on the land or bordering thereon, stile, well, drain, drainage ditch, sewer or cistern or any other earth-moving operation may have a lien separately or jointly upon the house, mill, manufactory or other building, bridge reservoir system of waterworks or other structure, sidewalk, walk, stile, well drain, drainage ditch, sewer or cistern or earth which they may have erected, altered, repaired, moved or removed or for which they may have furnished materials or machinery of any description, and, on the interest of the owner of the lot or parcel of land on which it stands or with which it is connected to the extent of the value of any labor done, material furnished, or either, including any use of such leased equipment and tools, and all claims for wages of mechanics and laborers employed in or about any shop, mill, wareroom, storeroom, manufactory or structure, bridge, reservoir, system of waterworks or other structure, sidewalk, walk, stile, well, drain, drainage ditch or cistern or any other earth-moving operation shall be a lien on all the machinery, tools, stock or material, work finished or unfinished, located in or about such shop, mill, wareroom, storeroom, manufactory or other building, bridge, reservoir, system of waterworks, or other structure, sidewalk, walk, stile, well, drain, drainage ditch sewer, or cistern or earth or used in the business thereof; and should the person, firm, or corporation be in failing circumstances the above mentioned claims shall be preferred debts whether claim or notice of lien has been filed or not,"

requirements. The finding that the mechanics' liens were invalid is supported by ample evidence that they were not filed within the sixty (60) day period, or were not sworn statements. The amounts paid by Root to discharge these invalid liens were paid voluntarily, and the "loss" cannot be passed on to Title Company.

In 8(b), the trial court found that the payment was made without a valid mechanic's lien having been filed, but within sixty (60) days of the date the last supplies, materials, and labor were furnished. This finding is clearly contrary to the evidence, which shows unequivocally that the last work was furnished on September 4, 1969, and that the check to Lake County Glass was dated November 28, 1969.[13] No mechanic's lien was filed by Lake County Glass. The payment clearly was made after the sixty-day period. The amount paid by Root was not paid to discharge a valid mechanic's lien, because no lien was ever filed. We need not decide what result we would reach had the payment been made within the sixty-day period, but before a mechanic's lien had been filed.

In 8(a), the trial court found that valid mechanics' liens were filed by the subcontractors listed. Finding 8(a)(2) is correct by stipulation of the parties. Finding 8(a)(6) is clearly erroneous, since there is no evidence that a mechanic's lien was ever filed by Overhead Door. As to findings 8(a)(1), (3), (4), and (5), this Court must determine if the evidence viewed in the light most favorable to the appellee Root supports the finding that valid mechanics' liens were filed by the named subcontractors as a result of Title Company's failure to obtain lien waivers. We find substantial evidence of probative value to support the findings of the trial court as to the validity of liens 8(a)(1) and 8(a)(5). However, as to 8(a)(5), there is no evidence that the filing was causally

---

13. It appears that Lake County Glass did not perform this work on PCI's credit, since PCI had left the job more than three months before the work was done. It is unclear who procured the services of this subcontractor.

connected to Title Company's failure to get a lien waiver. As to liens 8(a)(3) and 8(a)(4), we find no substantial evidence of probative value to support the trial court's finding of validity.

The evidence shows that all four subcontractors in 8(a)(1), 8(a)(3), 8(a)(4), and 8(a)(5) performed labor or furnished materials for the building on Root's property. The evidence further shows that all four subcontractors filed sworn statements of their intent to hold mechanics' liens on the property, specifically setting forth the amount claimed, the name and address of the claimant, the name of the owner, and the legal description of the property. The only question is whether the lien notices were filed within sixty days of the date the last labor was performed or the last materials were furnished.

A representative of A & B Concrete, 8(a)(1), testified that the lien was filed within sixty days. On cross-examination it was brought out that the A & B Concrete representative did not know the exact date on which the materials were last furnished, but thought the work was completed sometime in April. It is the duty of the trial court to resolve conflicts in the evidence. The trial court could have found that the A & B lien was filed within sixty days, even though the A & B representative could not recall the exact date the last work was performed. Thus, the trial court could have found that the lien filed by A & B Concrete was valid. Further, since the work was completed by A & B prior to the disbursement of the last $10,000.00 check to PCI, and Title Company could have obtained a lien waiver for the entire amount before disbursing funds to PCI, there is sufficient evidence of the causal connection between Root's obligation to discharge this lien and Title Company's failure to obtain a lien waiver.

A representative of Hobart Plumbing & Heating, 8(a)(5), testified that the last work was performed by Hobart on

May 28, 1969. The lien was filed on July 1, 1969. Clearly, the trial court could have found that the lien was timely filed and valid. However, the last work was performed by Hobart eight days after Title Company's disbursement of the last $10,000.00 check to PCI. There is no evidence that any work was performed prior to the disbursement of funds from escrow to PCI. Thus, there is no evidence to support the trial court's conclusion that Root's obligation to discharge this lien was causally connected to Title Company's failure to obtain a lien waiver from this subcontractor. Title Company could not have obtained a lien waiver from a subcontractor who had done no work when the funds were disbursed.[14]

No one from Airtite, 8(a)(4), or Beverly Metals, 8(a)(3), testified at the trial. The only testimony regarding the timely filing of these two mechanics' liens is that of Fred Cuppy, Root's attorney, who inquired of Airtite and Beverly Metals and was told that the liens were filed within sixty days. Cuppy did not know when the last work was done by the two firms. Cuppy's testimony regarding what he was told was objected to at trial as hearsay and was admitted only for the limited purpose of establishing what information Cuppy acted upon when he paid the subcontractors:

"Q. Now, with regard to Beverly Metal were you, in fact, told by someone that the lien had been filed within sixty (60) days?
"MR. LEENEY: Hearsay.
. . . .

---

14. Again, there is no evidence to sustain liability for the amount of this lien on any other theory. There is no suggestion that Title Company's disbursement of the $4,975.00 balance in the escrow account was wrongful because Title Company failed to obtain final waivers of liens prior to returning the funds to Root. There is no evidence that the work done by Hobart was necessary to make the building "substantially ready for occupancy," and, thus, there is no evidence that Root's obligation to Hobart was causally connected to Title Company's failure to obtain certificates of completion before disbursing funds to PCI. Further, there is no evidence that Root paid more than $259.89 to Hobart, although it appears that some exhibits are missing from the record.

"THE COURT: We will admit it for the fact that the statement [sic] was made. ...

"Q. With regard to Airtite was there a statement made by someone that their lien was timely filed?

"MR. LEENEY: Same objection as to the previous one.

"THE COURT: Show the objection and we will permit the question again on the same grounds, that the answer to the question is calculated only to prove what Mr. Cuppy was told and not to establish the date that the work was completed or the timely filing of the Mechanic's Lien."

Cuppy's testimony, therefore, has no probative value on the issue of the timely filing of these two liens. There is no other evidence in the record indicating when the last work was performed. The finding of the trial court that liens filed by Airtite and Beverly Metals were timely filed is not supported by the evidence and is clearly erroneous.

We conclude that the following amounts were proved by Root to have been damages sustained as a result of Title Company's breach of its agreement to obtain lien waivers:

A & B Concrete _____$2,022.00
Zarko Sekerez _____ 108.00

TOTAL _____$2,130.00

These amounts were paid by Root to discharge valid mechanics' liens filed against its property as a result of Title Company's failure to obtain lien waivers before disbursing funds to PCI. To this extent, we affirm the judgment of the trial court.

As to the other conclusions of liability, we find that Title Company's liability to Root was not proved by sufficient evidence of probative value to support the conclusion that the damage suffered by Root was causally attributable to Title Company's breach of the escrow agreement.

We further refuse to award AP. 15(F) discretionary damages, as requested by Root, since it is apparent that this appeal was taken in good faith on legal and equitable grounds. *Marshall* v. *Reeves* (1974), 262 Ind. 403, 316 N.E.2d 828.

To the extent that we find Title Company liable to Root in the sum of $2,130.00, we affirm the judgment of the trial court.[15] To the extent that the trial court found ██ ██ further liability, we reverse the trial court and remand for entry of judgment consistent with this opinion.

Reversed in part and affirmed in part.

Hoffman, J. and Garrard, J., concur.

NOTE.—Reported at 339 N.E.2d 103.

15. The trial court originally entered judgment against Title Company for $20,394.04, but then reduced the judgment to $15,419.04. This reduction was to account for the $4975.00 balance in the escrow account returned to Root, but the reason for the set-off is unclear. Apparently, the trial court's theory was that Root paid $15,419.04 more for the building than the original contract price of $35,000.00, and, since there were no extras for which Root was responsible, Title Company's breach caused damage to Root to the extent that Root paid more than the agreed $35,000.00. We conclude that Title Company is liable to Root to the extent that valid liens were filed against Root's property as a result of Title Company's failure to obtain lien waivers before disbursing funds to PCI. We find no basis in the law or in the evidence for a set-off against Title Company's liability.

In addition, the question of set-off is a question of mitigation of liability. While Root had the burden of proof of the extent of its damages and the causal connection between its loss and Title Company's breach, Title Company had the burden of proving matters mitigating its liability. *Cincinnati, I., St. L. & C. Ry.* v. *Lutes* (1887), 112 Ind. 276, 11 N.E. 784. Title Company offered no evidence and no witnesses on its behalf. Title Company argued on appeal that its liability should be limited to amounts paid by Root to discharge valid liens and agreed that there was one valid lien for $108.00 filed by Zarko Sekerez. Title Company prayed that we reduce the judgment against it to $108.00, but made no argument that any amount should offset its liability to this extent. In light of the fact that Title Company offered no evidence

to prove why there should be a set-off in mitigation of its liability, and made no argument on appeal that any amount should be set-off against amounts paid to discharge valid liens, and because our independent review of the record reveals no basis in law or evidence for a set-off, we conclude that there should be no set-off in mitigation of Title Company'c liability for $2,130.00.