JOS. SCHLITZ BREWING COMPANY *v.* CENTRAL BEVERAGE CO., INC. AND NUMBER ONE BEVERAGE, INC.

[No. 1-1075A172. Filed February 3, 1977. Rehearing denied March 10, 1977. Transfer denied March 10, 1978.]

*John D. Noland, Charles E. Bruess, Barnes, Hickam, Pantzer & Boyd,* of Indianapolis, for appellant.

*Frank E. Gilkison, Charles R. Clark, White Pierce Beasley & Gilkison,* of Muncie, for appellee.

LOWDERMILK, J.—Defendant-appellant, Jos. Schlitz Brewing Company (Schlitz) appeals from the judgment of the trial court awarding plaintiff-appellee, Central Beverage Co., Inc. (Central) compensatory damages in the amount of $1,661.00, punitive damages in the amount of $50,000.00, and an injunction.

The facts necessary for our disposition of this appeal are as follows: Central is a multiple brand beer wholesaler licensed to distribute beer in Indiana. From 1934 to June 29, 1966, Central had been distributing Schlitz beer products primarily in Delaware County, Indiana, as a partnership. On June 29, 1966, Central incorporated and commenced doing business as a corporation on July 1, 1966. On August 29, 1966,

Schlitz and Central executed a "Declaration of Terms" the pertinent parts of which were as follows:

"* * *

Gentlemen:

The undersigned, as an inducement for and in consideration of your hereafter making a sale or sales of your products to the undersigned, hereby warrants, agrees and represents that all sales and other transactions, between you (hereinafter designated as 'Seller') and the undersigned (hereinafter designated as 'Buyer'), have been and shall be governed by the following terms and conditions:

4. Buyer agrees that Seller may at any time, at Seller's option and without cause, and without incurring any liability to Buyer: (a) refuse to accept any order received from Buyer; (b) cancel all or any unfilled portion of any order after acceptance; (c) postpone shipment of all or any part of any order; (d) ship via route or routes other than shown on Buyer's order; and/or (e) ship quantities greater than those ordered by Buyer, when necessary to completely fill railway cars or other conveyances, which extra quantities Buyer shall accept and pay for as though expressly ordered by Buyer.

5. *The relationship btween the parties is exclusively that of Buyer and Seller, and may be terminated by either party at any time, without cause and without notice.* In such event Seller may stop and reclaim any shipments then in transit to Buyer, and Buyer shall immediately; (a) deliver to Seller all signs, displays, cards and other advertising material then in Buyer's possession bearing Seller's name, trade mark, label or other insignia together with all utility items for which no charge has been made to Buyer; (b) remove all such names, trade names, trade marks, labels or other insignia from Buyer's buildings, trucks, employee uniforms, stationery and other property; (c) thereafter refrain and instruct its employees to refrain from removing, defacing or tampering with any of Seller's advertising material, on any retail premises or elsewhere. Buyer acknowledges that Seller has granted no franchise or exclusive territory to Buyer, and Seller may, at any time without incurring any liability to Buyer, sell its products to others in the same trade area as Buyer. . . . (Our emphasis.)

* * *"

On January 20, 1972, Carlton Thom, Schlitz's Indianapolis District Manager met with Central to conduct a 1972 whole-

saler analysis. As a result of this analysis Central was ranked as unsatisfactory because of its failure to adopt and implement certain "internal controls" designed by Schlitz. At trial, there was evidence which established that Central had adopted at least, in part, some of the thirty internal controls which Schlitz found lacking, and other evidence that they were unnecessary for a beer wholesaler the size of Central.

The results of Thom's wholesaler analysis were sent to William Hargis, Schlitz's Bluegrass Division Manager. On March 1, 1972, Hargis and Thom met with Central representatives to review the lack of Central's internal controls. Following this meeting, by making twelve calls on retailers, Hargis and Thom discovered approximately 30 cases of old beer on retailer's shelves, and that neither the advertising or the placement of Schlitz products was competitive. Central claimed the reason the old beer was on the market was because Schlitz had failed to pick up the older discontinued labeled beer from it and place it in another market as promised. Thereafter, on March 2, 1972, internal controls were again discussed and Howard Bratton, Central's sales manager, said he would try to correct the problem areas by April 15, 1972. On March 14, 1972, Hargis wrote Central a letter confirming their meeting of March 1 and 2, 1972, and set April 15, 1972, as a requested meeting date to review Central's progress toward implementing internal controls.

In April, 1972, Hargis directed three district managers to conduct a retail analysis of Central's market and to offer their services to Central to help implement Schlitz's internal controls. Hargis returned to Central on May 17, 1972, and found some old beer products still on retailer's shelves, and that Central had not implemented Schlitz's internal controls. Between the meetings of March 14, 1972, and May 17, 1972, Central's sales manager, Bratton, was away from work for six weeks because of illness, and Central's truck drivers went on strike on April 28, 1972. At this meeting Hargis informed

Central that he would recommend to William Timpone, Field Sales Director for Schlitz, that a new wholesaler be appointed to replace Central. On June 1, 1972, Central representatives met in Milwaukee with Schlitz representatives in an effort to get a 30-day extension of time in order to resolve the internal controls problem. At this meeting Central refused to resign as a Schlitz wholesaler and Schlitz denied Central's request for an extension of time. On June 2, 1972, Schlitz mailed a termination letter to Central which was received on June 5, 1972. As of February, 1972, none of the Schlitz distributors, except Indianapolis, in either of the Indianapolis or Kokomo districts, had adopted the internal controls which Schlitz sought to require Central to adopt, and all of these wholesalers, with the exception of Indianapolis, were rated by Schlitz as unsatsfactory. Of these approximately 21 wholesalers only Central and Sanitary Beverage were terminated. The record discloses that some Indiana wholesalers had adopted Schlitz's internal controls. In 1969, Schlitz communicated to a Central representative that Indiana could be served by only 8 or 10 wholesalers. Also, in November, 1973, prior to trial, Schlitz indicated to a Lafayette wholesaler its intent to consolidate certain Indiana wholesalers. Contrary to this evidence the record discloses that Schlitz, between 1969 and 1973, appointed two new wholesalers.

During December, 1971, Schlitz representatives met with representatives of Number One Beverage, Inc., the Schlitz wholesaler in Madison County, Indiana, to discuss the possible expansion of its distribution area into Grant County, Indiana.

On June 3, 1972, Number One Beverage was requested to serve the Muncie and Marion markets. These were the areas formerly served by Central and Sanitary Beverage. The record discloses that at this point in time Number One Beverage had some of the same deficiencies in internal controls as had Central and Sanitary Beverage before their termination.

On June 10, 1972, Timothy Norstrum, Schlitz's Kokomo

District Manager, wrote a letter to Hargis concerning Dick Quinn, president of Number One Beverage, the pertinent parts of which were as follows:

"Dick Quinn is only afraid currently that the brewery will back out if the pressure becomes too great. I hope that you can assure him that this won't happen when you next meet him. Also, I hope that you can find some way to develop brewery support for selected wholesalers (Quinn) in Indiana. If Quinn makes this one fly, you just won the entire state. "Quinn is open to any program (swining) [sic] which will increase his and our business, and I hope that we can find a few little goodies for him to run with in the next six months while he opens the Marion and Muncie markets."

On December 26, 1974, the trial court made the following pertinent Findings of Fact and Conclusions of Law:

## "SPECIAL FINDINGS OF FACT
\* \* \*

7. That at all times involved in this action, Central operated as a wholesale distributor of malt beverage in the Delaware County, Indiana, market, which had a population of approximately 130,000, including the City of Muncie, Indiana, with a population of approximately 80,000, and the university enrollment of Ball State University of approximately 18,000, and a black ethnic population of approximately 18,000. That in this market there were 150 retail accounts, of which, prior to June 5, 1972, five were classified by Central as college accounts, five as ethnic accounts, eight as chain store accounts; there were thirty accounts purchasing draught beer, and not more than ten accounts were classified by Central as non-buying accounts.

10. In the five years immediately preceding the year 1972, the sales by Central in cases of Schlitz and Schlitz products were as follows:

|  | Schlitz | Schlitz Malt Liquor | Old Milwaukee | Totals |
|---|---|---|---|---|
| 1967 | 12,944 | 2,135 | 2,233 | 17,362 |
| 1968 | 15,350 | 2,022 | 1,375 | 18,747 |
| 1969 | 15,420 | 2,317 | 1,575 | 19,312 |
| 1970 | 17,689 | 3,028 | 2,327 | 23,044 |
| 1971 | 18,762½ | 3,010 | 2,502 | 24,274½ |

11. Central did a gross business in sales of beer in the year 1971 of 274,302 cases, and gross business in 1972 of

251,874½ cases, with gross sales receipts in excess of One Million Dollars in each of said years.

13. Central had never had any complaints from any other brewers it represented. A former representative of the Falstaff Brewing Company, Robert F. Hensley, testified that Central was slightly above average of the forty-four wholesalers he called on as District Sales Manager for Falstaff. Kenneth Williams, a former District Sales Manager for Indiana for the Stroh Brewing Company, another brewer represented by Central, testified that of the twenty-seven wholesalers he served, Central ranked first or second.

14. Prior to June 5, 1972, Central operated with a Sales Manager who was also a full-time salesman with twenty-five years' experience, one additional full-time salesman with ten years' experience and a part-time salesman with twenty-four years' experience. That the Sales Manager and salesmen were aware of sales of all brands and packages of beer in the market and were aware of competition product and sales in the various retail accounts. That the Sales Manager and salesmen met almost daily and discussed the market and the beer business in the Delaware County market.

15. That each of Central salesmen was responsible for placing in retail accounts advertising material received from brewers known as 'point of sale.' Said salesmen carried 'point of sale' material in their automobiles for such purpose, obtaining it from a central storage area in the Central warehouse.

16. In 1969 and 1970 Central expanded its warehouse and office facilities to meet its increasing sales, which expansion was done in reliance on a continuing relationship with Schlitz and the other brewers represented by Central.

19. That at all times involved in this action, Central had operated its business at a profit, was fully solvent, and had operated its business in conformity to the alcoholic beverage laws and regulations of the State of Indiana and the United States of America.

20. Prior to June 5, 1972, Central kept the following records with respect to sales and distribution of the products sold by it and by the competition in its market in Delaware County:

  (a) Daily sales record of sales of each package of each brand for each account—totaled each month. (pltf's Ex. 5, 5A)

  (b) Monthly sales balances for each account. (Pltf's Ex. 6)

(c) Ledger showing daily sales of each package and brand, totaled monthly, each week compared with previous week plus monthly sales analysis (also shows cash receipts and disbursements). (Pltf's Ex. 4)

(d) Inventory record containing sales goals. (Pltf's Ex. 7)

(e) Record of sales by cases per week compared to same week of previous year, cumulated per year, containing annual sales goals. (Pltf's Ex. 8)

(f) Record of cases sold per month compared with previous years. (Pltf's Ex. 26)

(g) Record of comparative sales of all brands in Delaware County. (Pltf's Ex. 20)

(h) Record of sales to top 60 accounts. (Pltf's Ex. 9)

(i) Record of cumulative monthly sales and per cent of market for each Delaware County wholesaler. (Pltf's Ex. 21)

(j) Record of sales to top 20 accounts. (Pltf's Ex. 9, 10, 10A, 10B)

(k) Distribution analysis, color coded for each package of of each beer for each account. (Pltf's Ex. 11, 12, 13)

(l) Distribution analysis showing when account commenced buying a particular package. (Pltf's Ex. 11)

(m) Record showing all brand sales in Delaware County and relative standing. (Pltf's Ex. 19, 19A)

21. That Schlitz had adopted certain record keeping requirements which it sought to have its wholesalers keep and maintain, which records were referred to by Schlitz as 'internal controls' and which records related to sales and distributions. It was Schlitz's policy and intent that all of its wholesalers in the United States of America, regardless of size, population, sales volume, or location, should adopt and use these 'internal controls' and keep all of the various records designated by Schlitz as 'internal controls.'

24. Delaware County, served by Central, was in Schlitz's Indianapolis District. Prior to June 5, 1972, the other cities and counties having a Schlitz wholesaler in the Indianapolis District were as follows: Indianapolis, Marion County; Anderson, Madison County; Greenfield, Hancock County; Lebanon, Boone County; New Castle, Henry County; Noblesville, Hamilton County; Rushville, Rush County; and Winchester, Randolph County. The cities and counties having a Schlitz wholesaler in the Schlitz Kokomo District at said time were:

Marion, Grant County; Crawfordsville, Montgomery County; Delphi, Carroll County; Fowler, Benton County; Frankfort, Clinton County; Hartford City, Blackford County; Kokomo, Howard County; Lafayette, Tippecanoe County; Logansport, Cass County; Monticello, White County; Peru, Miami County; and Veedersburg, Fountain County. As of February 1972, none of the Schlitz's distributors, except for Indianapolis, in either of the Indianapolis or Kokomo Districts, had adopted the internal controls which Schlitz sought to require Central to adopt; all of said wholesalers, except Indianapolis were rated by Schlitz as unsatisfactory for this reason; and all of said wholesalers, except Indianapolis, were listed on Schlitz's records as substantially the same deficiencies concerning the internal controls as Central.

30. At the time Schlitz granted the Delaware County area previously served by Central and the Grant County area theretofore served by Sanitary Beverage to Number One. Number One had substantially all of the same deficiencies as to internal controls as those deficiencies ascribed by Schlitz to Central and Sanitary Beverage.

31. That no other wholesalers in either the Indianapolis Districts or Kokomo Districts were terminated by Schlitz, although all of the other wholesalers in said districts, except Indianapolis, had substantially all of the same deficiencies as to the internal controls as did Central and Sanitary Beverages.

36. That the amount of overage Schlitz products found in the market was primarily Schlitz Malt Liquor bearing a discontinued label which Schlitz representatives had promised Central that they would pick up and replace in another market which was not then handling the new label. However, Schlitz did not do this; and Central then sold the Schlitz Malt Liquor at reduced prices to certain retail customers.

39. Schlitz does not approve of the system of beer distribution in Indiana, wherein there is a wholesaler in each county; and Schlitz representatives have stated that Schlitz feels that there should be only eight to ten wholesalers in the entire State of Indiana.

40. The records maintained by Central were adequate records for the operation of a beer wholesaler of the size and type of Central, doing the volume of business which Central did, in a market area of the size of the Delaware County market.

42. If Cenral loses Schlitz products, Central will lose approximately 9 per cent of its gross business volume. Central will not be able to reduce the size of its warehouse, the number of its employees, or any of its other expenses and overhead as the result of losing the Schlitz products and will sustain a substantial loss of profits by reason of the loss of Schlitz products.

43. That during the time when Schlitz products were unavaliable to Central, following the termination letter dated May 31, 1972, mailed June 2, 1972, and received on June 5, 1972, by Central, until Schlitz again became available to Central by reason of the temporary injunction issued by the Delaware Circuit Court, Central sustained a loss and damages in the amount of $1,661.00. That Central's loss of profits from the loss of Schlitz products would be approximately $13,000.00 per year.

44. That the termination of Central by Schlitz was done by Schlitz in furtherance of its intent and purpose to consolidate its wholesalers in the State of Indiana and to reduce the number of wholesalers. That the temination of Central in Delaware County and Sanitary Beverage in Grant County, and the giving of the Delaware and Grant County areas to Number One in Madison County was done as part of Schlitz's plan, purpose and intent, and design to consolidate its wholesalers.

45. That Schlitz had also expressed an interest in the consolidation of its Kokomo, Lafayette, and Logansport wholesalers, and had at one time approached its wholesaler in Lafayette, Mr. James Lamb, to inquire if he was interested in expanding his operation into other counties. That Schlitz's intent and purpose to consolidate its wholesalers in Indiana is further evidenced by a letter dated June 10, 1972, . . .

46. That the termination of Central was done by Schlitz willfully and intentionally, and as part of its plan and purpose to consolidate the wholesale distribution of Schlitz products in Indiana, and to control the operation of its wholesalers, contrary to the provisions and purpose of the Indiana Alcoholic Beverage laws and that such termination and cancellation of Central by Schlitz was done unfairly and without due regard to the equities of the wholesaler.

## CONCLUSIONS OF LAW

4. That the relationship between the plaintiff, Central Beverage Co., Inc., and the defendant, Jos. Schlitz Brewing Company pursuant to the instrument known as Declaration

of Terms, entered into on August 29, 1966, is subject to the laws of the State of Indiana and to Chapter 257 of the Acts of 1965 (IC 7-2-1-23, Ind. Stat. Ann., Sec. 12-451(a)), and that such statute and all other provisions of the applicable statutory laws of the State of Indiana pertaining to alcoholic malt beverages binding on the parties, and any agreements made by the parties are subject to the law of the State of Indiana pertaining to alcoholic beverage regardless of any provisions to the contrary in such agreements.

5. The defendant Schlitz did in June 1972, unfairly and without due regard for the equities of Central and without just cause and provocation terminate its agreement and relationship with Central in violation of the applicable statute.

6. A valid and binding agreement and relationship exists between Central and Schlitz for the right of Central to buy from Schlitz and to distribute in Delaware County, Indiana, Schlitz products for an indefinite term and until such time as the parties mutually agree to terminate, or the agreement is fairly terminated by either party for just cause or provocation and with due regard to the equities of the other party, or such agreement shall be otherwise lawfully terminated pursuant to the Indiana law.

7. Central is entitled to a permanent injunction against Schlitz prohibiting Schlitz from cancellation or termination of its agreement with Central and ordering Schlitz to sell its products to Central for distribution by Central thereof so long as such agreement is valid and binding as set forth above.

8. Central is entitled to a judgment against Schlitz in the amount of $1,661.00 representing actual damages sustained as the result of the unlawful termination.

9. The purported grounds for termination of Central by Schlitz were not genuine, and the actions by Schlitz in terminating Central were in bad faith pursuant to a plan and devised by Schlitz to terminate unlawfully, and thereby consolidate and reduce the number of its wholesalers in Indiana, contrary to the statute concerning termination of wholesalers and contrary to statute prohibiting a brewer from having an interest in or control in the business of a wholesaler and prohibiting multi-county control over wholesale beer distribution.

10. That Schlitz's insistence and requirement that all of its wholesalers adopt and put into effect the Schlitz system

of internal controls without regard to whether or not the wholesaler, for whose benefit the controls purportedly were designed, considered the internal controls relevant or necessary to the wholesalers' operation constituted an attempt by Schlitz to dominate and control the conduct of business of beer wholesalers contrary to law.

11. That Central is entitled to judgment for punitive damages against Schlitz in the amount of Fifty Thousand Dollars ($50,000.00).

## ISSUES

1. Whether there was a contract or agreement between Central and Schlitz within the meaning of IC 1971, 7-2-1-23(a) (Burns Code Ed.).

2. Whether the trial court retroactively applied IC 1971, 7-2-1-23(a).

3. Whether the trial court impaired Schlitz's vested rights in applying IC 7-2-1-23(b), or purported to create a new civil remedy.

4. Whether the trial court's Finding of Fact No. 46 and Conclusion of Law No. 9 are contrary to law.

5. Whether the trial court's Conclusion of Law No. 10 is contrary to law.

6. Whether there is sufficient evidence to find that Schlitz's termination of Central was unfair, without due regard for the equities and was without just cause or provocation.

7. Whether the trial court's judgment and injunction were erroneous because (1) equitable relief was improper, (2) an invalid burden was imposed upon Schlitz, and (3) the judgment imposes stricter standards than those set out in IC 1971, 7-2-1-23(a)(2).

## DISCUSSION AND DECISION

*Issue One*

Schlitz argues that the trial court erred in finding a contract or agreement between it and Central within the meaning of

IC 1971, 7-2-1-23(a) (Burns Code Ed.)[1] which provides as follows:

> "Illegal coercion by wholesalers and brewers—illegal agreements—Unethical terminations—Injunctions—Investigations by commission.— (a) It shall be unlawful for any wholesaler of alcoholic malt beverages or brewer licensed by the state of Indiana or brewer, or other person located outside the state of Indiana who sells alcoholic malt beverages to an Indiana permittee for the purpose of importation into Indiana and resale therein, or any officer, agent or representative of such: (1) to coerce, or attempt to coerce, or persuade any person licensed to sell alcoholic malt beverages at wholesale, to enter into any agreement or to take any action, which will violate, or tend to violate, any of the laws of the state of Indiana regulating the sale and distribution of alcoholic malt beverage or any of the rules or regulations duly adopted and promulgated by the Indiana alcoholic beverage commission; or
>
> (2) *unfairly, without due regard to the equities of such wholesaler or manufacturer of alcoholic malt beverages and without just cause or provocation, to cancel or terminate any agreement or contract, written or oral, hereafter entered into by and between a wholesaler and manufacturer, for the sale of alcoholic malt beverages.*" (Our emphasis)

Specifically, Schlitz contends that the Declaration of Terms as set forth in pertinent part, *supra,* did not in and of itself create a binding enforceable contract. We agree that the Declaration of Terms executed between the parties herein did not in and of itself create a valid contract. The contract appears to be illusory. *Warwick Beverage Corp.* v. *Miller* (1976), 170 Ind. App. 114, 352 N.E.2d 496. However, the trial court could have found a valid agreement existed between Schlitz and Central *vis a vis* their conduct and continuing recognition that an agreement for the wholesale distribution of beer existed between them. IC 1971, 26-1-2-204 (Burns Code Ed.) provides in pertinent part as follows:

> "Formation in general.— (1) *A contract for sale of goods may be made in any manner sufficient to show agreement,*

---

1. IC 1971, 7-2-1-23 (Burns Code Ed.) was repealed by Acts 1973, P.L. 55, Sec. 1, p. 290, and in its present form is found at IC 1971, 7.1-5-5-9 (Burns Supp. 1976).

*including conduct by both parties wihich recognizes the existence of such a contract.*

(2) . . .

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." (Our emphasis)

The record discloses the following facts which tend to support the finding of the trial court that Schlitz and Central did have an agreement within the meaning of IC 1971, 7-2-1-23(a) (2), *supra.* Central, since July 1, 1966, and its predecessor partnership since 1934, has been the sole wholesaler of Schlitz beer products in Delaware County, Indiana. The parties recognized that Central had certain obligations including the acceptance and dissemination by Central of Schlitz advertising, continuous efforts to secure greater distribution of Schlitz products and better position on retail shelves and coolers, continuous efforts to sell and install special displays and promotion of Schlitz products in retail outlets, special efforts for introducing new Schlitz products, continuous efforts to develop the college market, continuous consultation with Schlitz representatives concerning all facets of the sales and marketing of Schlitz products, the use of Schlitz forms in ordering products and in making market reports to Schlitz, and continuous efforts to follow Schlitz policy in keeping fresh beer in retail outlets. At the meeting held on June 1, 1972, Schlitz's corporate counsel asked Central to resign. In the absence of a recognition between the parties of some type of agreement there would have been nothing for Central to resign from. Also, Schlitz gave Central a formal notice of termination rather than simply failing to supply beer to Central which Schlitz claimed it had the power to do under Declaration of terms executed between them.

We are of the opinion that this evidence was sufficient to permit the trial court to conclude that an agreement within the meaning of IC 1971, 7-2-1-23(a) (2), *supra,* did exist between Schlitz and Central.

*Issue Two*

Schlitz argues that the trial court erred in applying IC 1971, 7-2-1-23(a), *supra,* to its relationship with Central because Central, and the predecessor Lewis-Turner partnership, has been distributing Schlitz beer products in Delaware County, Indiana, since 1934. The effective date of IC 1971, 7-2-1-23 (a), *supra,* was March 11, 1965, and by its terms applies to contracts or agreements "hereafter entered into".

The record discloses that Schlitz and Central executed their Declaration of Terms on August 29, 1966, after the effective date of IC 1971, 7-2-1-23(a), *supra.* The fact that Schlitz had a working relationship with the Lewis-Turner partnership which did not alter substantially when it incorporated on June 29, 1966, and became Central Beverage, Inc., does not alter the fact Central was a new corporate entity which Schlitz chose to have formally adopt a Declaration of Terms on August 29, 1966, after the effective date of IC 1971, 7-2-1-23 (a), *supra.*

*Issue Three*

Schlitz argues that the trial court errer in giving retroactive application to IC 1971, 7-2-1-23(b) (Burns Code Ed.) which provides as follows:

> "(b) The circuit or any superior court of the county wherein the premises of the wholesaler are located is hereby vested with jurisdiction and power to enjoin the cancellation or termination of a franchise or agreement between a wholesaler and a brewery, at the instance of such wholesaler or brewer who is or might be adversely affected by such cancellation or termination, *and, in granting an injunction, the circuit or any superior court shall provide that no brewery shall supply the customers or territoy of the wholesaler through servicing the territory or customers through distributors or means, while the injunction is in effect:* Provided, however, That any injunction issued under this section shall require the posting of proper bond against damages for an injunction unprovidently granted and a showing that the danger of irrevocable loss or damage is immediate, and, that during the pendency of such injunction the whole-

saler shall continue to service the accounts of the brewer in good faith." (Our emphasis)

Schlitz terminated its agreement with Central by letter dated June 2, 1971, and subsection (b), *supra,* did not become effective until July 28, 1972. The part of the trial court's judgment of which Schlitz complains is as follows:

"IT IS FURTHER CONSIDERED, ORDERED, ADJUDGED, AND DECREED by the Court that the defendant, Jos. Schlitz Brewing Company, shall not supply the customers or territory of Central Beverage Co., Inc., the same constituting Delaware County, Indiana, to servicing the territory or customers through other distributors or means during the period of time that Jos. Schlitz Brewing Company and Ceneral Beverage shall have an agreement between them."

It is the general rule that statutes should be given prospective operation only unless a contrary legislative intent is clearly expressed therein. *Malone* v. *Conner* (1963), 135 Ind. App. 167, 189 N.E.2d 590, 591. It is also the rule that a statute may be given a retroactive application when it is necessary to carry out the purpose of the law, or where only a new remedy is provided and new rights are not created or existing rights eliminated. *Pathman Construction Company* v. *Knox County Hospital Association* (1975), 164 Ind. App. 121, 326 N.E.2d 844, 848.

It appears from a reading of the trial court's judgment that it patterned the remedy given Central on IC 1971, 7-2-1-23(b), *supra.* Therefore, since Schlitz had the right to serve customers in Delaware County through wholesalers in addition to Central before the trial court's injunction, it could be argued the trial court erred in giving a retroactive application to IC 1971, 7-2-1-23(b), *supra.*

However, we are of the oipnion that no error was committed, or if committed, it was harmless. This court will construe a judgment in such a manner as will sustain its validity if possible. *Schmidt Enterprises, Inc.* v. *State* (1976), 170 Ind. App. 628, 354 N.E.2d 247, 251. A reasonable

construction of the trial court's judgment demonstrates that it represents nothing more than the exercise of a court's inherent equitable power under appropriate circumstances to provide a party with a complete remedy in the form of an injunction.

Therefore, our review of the propriety of the trial court's injunction complained of by Schlitz is limited to whether a clear abuse of discretion has been demonstrated. *Elder* v. *City of Jeffersonville* (1975), 164 Ind. App. 422, 329 N.E.2d 654, 657; *Hickey* v. *Hickey* (1973), 156 Ind. App. 610, 298 N.E.2d 29, 32. Schlitz argues that the effect of the trial court's prohibitory injunction, *supra,* is to give Central a franchise or exclusive territory in violation of the Declaration of Terms which allowed Schlitz to sell its beer products to others in Central's trade area thereby impairing its (Schlitz's) vested rights.

As noted above, this court, if possible, will construe a trial court's judgment in such a manner as will sustain its validity. Therefore, we do not construe the trial court's judgment, as contended by Schlitz, as restraining it from selling its beer products to wholesalers throughout the State of Indiana. Rather, we are of the opinion that a fair construction of the judgment only prevents Schlitz from selling its products directly to Central's customers, or establishing wholesalers, or entering into contracts with existing wholesalers, or to perform any other act with the intent and purpose of placing Central at a disadvantageous competitive relationship when serving its existing customers. In other words, since Schlitz cannot terminate its agreement with Central *directly* except pursuant to IC 1971, 7-2-1-23 (a) (2), *supra,* it should not be permitted to do so *indirectly*.

Since Indiana permits a beer wholesaler in one county to sell its beer products to retailers in another county, Central does not have an exclusive territory or franchise to sell Schlitz beer products in Delaware County as contended by Schlitz.

As we have stated, *supra,* the 1972 amendment to IC 1971, 7-2-1-23, adding subsection (b), did not create a remedy which

the trial courts of our jurisdiction have not traditionally had available to them in the exercise of their inherent equity jurisdiction, when called upon to fashion a complete remedy; therefore, Schlitz's argument that subsection (b) creates a new civil remedy, and should not be given a retroactive application, is without merit.

### Issue Four, Five and Six

We have elected to consolidate Schlitz's assignments of error four, five and six because of their similarity.

Schlitz argues that the trial court erred in its Conclusions of Law No. 9 and 10 which provided as follows:

> "9. The purported grounds for termination of Central by Schlitz were not genuine, and the actions by Schlitz were not genuine, and the actions of Schlitz in terminating Central were done in bad faith pursuant to a plan and devised by Schlitz to terminate unlawfully, and thereby consolidate and reduce the number of its wholesalers in Indiana, contrary to the statute concerning termination of wholesalers and *contrary to the statute prohibiting a brewer from having an interest in or control in the business of a wholesaler and prohibiting multi-county control over wholesale beer distribution.*
>
> 10. That Schlitz's insistence and requirement that all of its wholesalers adopt and put into effect the Schlitz system of internal controls without regard to whether or not the wholesaler, for whose benefit the controls purportedly were designed, considered the wholesalers' operation constituted an attempt by Schlitz to dominate and control the conduct of business of beer wholesalers contrary to law." (Our emphasis)·

We agree with Schlitz that there is no Indiana statute prohibiting a beer wholesaler from selling its products in more than one county. See, IC 1971, 7.1-3-3-5 (Burns Supp. 1976). Likewise, it would not be improper for a brewer to consolidate its wholesalers if done so lawfully, and not in violation of IC 1971, 7-2-1-23(a) (2), *supra.* However, it does not necessarily follow from this statute that multi-county *control* over a beer

wholesaler's business by a brewer has been affirmatively sanctioned by our legislature. On the contrary, we are of the opinion that such conduct has been proscribed by our legislature.

IC 1971, 7.1-5-9-2 (Burns Supp. 1976) provides:

> "It is unlawful for the holder of a brewer's permit to hold, acquire, possess, own, or control, or to have an interest, claim or title, in or to an establishment, company, or corporation, holding or applying for a beer wholesaler's permit under this title [7.1-1-1-1—7.1-5-11-16], or in its business."

IC 1971, 7.1-3-3-18 (Burns Supp. 1976) provides:

> "The transfer, sale, acquisition, assignment, control of, or beneficial interest, direct or indirect, in or to a beer wholesaler's permit, or in its business, or in its corporate stock, by a brewer contrary to the provisions of IC 1971, 7.15-9-2, or the transfer, assignment upon the capital stock book, or other corporate record, of a corporation holding a beer wholesaler's permit, of the capital stock, or a part of it, is wholly void and not capable of validation."

These statutes prohibit, *inter-alia,* a brewer from controlling the business of its wholesalers. This is true whether the wholesaler sells the brewer's products in one county, or in two or more counties; and, hence, may properly be characterized as a multi-county beer wholesaler.

Schlitz argues that IC 1971, 7.1-5-9-2, *supra,* prohibits a brewer from having only a *financial interest* in a wholesaler's business.

We are of the opinion that when IC 1971, 7.1-5-9-2, *supra,* is read in conjunction with IC 1971, 7.1-3-3-18, *supra,* which prohibits a brewer from having *direct or indirect* control of a wholesaler's business *or* in its corporate stock, our legislature intended to prohibit brewer interference with management operations other than merely prohibiting brewers from having some financial interest in their wholesaler's businesses.

Schlitz argues that the trial court erred in Conclusion of Law No. 10, *supra.*

Schlitz contends that the internal controls it sought to have Central implement did not violate IC 1971, 7.1-5-9-2, or IC 7.1-3-3-18, *supra.*

The word control has been defined as the exercise of restraining or directing influence over; or to regulate, restrain, dominate, hold from action, overpower, counteract or govern. Black's Law Dictionary 399 (4th ed. 1951).

The record discloses that Schlitz sought to have Central adopt thirty working controls in spite of the fact that Central considered them unnecessary. Also, there was expert testimony presented at trial to the effect that Schlitz's internal controls were unnecessary for a beer wholesaler the size of Central.

We are of the opinion that the thirty internal controls which Schlitz sought to have Central adopt could properly be viewed as an attempt by Schlitz to directly influence the operations and managerial decision making processes of Central's business, and, therefore, the trial court's Conclusion of Law No. 10 is not clearly erroneous.

Schlitz argues that the evidence is insufficient to support the trial court's Special Finding of Fact No. 46 and Conclusion of Law No. 5 that it had violated IC 1971, 7-2-1-23 (a) (2), *supra,* when it terminated Central as a wholesaler. Specifically, Schlitz challenges the trial court's finding that it was engaged in an unlawful plan to consolidate the number of wholesalers in Indiana.

Any termination of a brewer-wholesaler agreement must be made in accordance with IC 1971, 7-2-1-23 (a (2), *supra.* Clearly, the grounds for a valid termination under IC 1971, 7-2-1-23 (a) (2), *supra,* must be genuine, and not a mere subterfuge. The trial court found in Conclusion of Law No. 9, *supra,* as well as in Conclusion of Law No. 5 and Special Findings of Fact No. 44 and 46, that Schlitz had not met the requirements of IC 1971, 7-2-1-23 (a) (2), *supra,* when it terminated its agreement with Central.

The trial court's Conclusion of Law No. 5 and Special Findings of Fact No. 44 and 46 provided as follows:

"5. The defendant Schlitz did in June 1972, unfairly and without due regard for the equities of Central and without just cause and provocation terminate its agreement and relationship with Central in violation of the applicable statute.

44. That the termination of Central by Schlitz was done by Schlitz in furtherance of its intent and purpose to consolidate its wholesalers in the State of Indiana and to reduce the number of wholesalers. That the termination of Central in Delaware County and Sanitary Beverage in Grant County, and the giving of the Delaware and Grant County areas to Number One in Madison County was done as part of Schlitz's plan, purpose, intent, and design to consolidate its wholesalers.

46. That the termination of Central was done by Schlitz willfully, intentionally, and as part of its plan and purpose to consolidate the wholesale distribution of Schlitz products in Indiana, and to control the operation of its wholesalers, contrary to the provisions and purpose of the Indiana Alcoholic Beverage Laws and that such termination and cancellation of Central by Schlitz was done unfairly and without due regard to the equities of the wholesaler."

When reviewing the sufficiency of the evidence to support the judgment of a trial court this court will neither weigh the evidence nor judge the credibility of witnesses, rather, this court will affirm the judgment of the trial court if supported by sufficient evidence when viewed most favorably to the appellee. *Lake County Title Co.* v. *Root Enterprises, Inc.* (1975), 167 Ind. App. 559, 339 N.E.2d 103; *Lou Leventhal Auto Co., Inc.* v. *Munns* (1975), 164 Ind. App. 368, 328 N.E.2d 734.

The evidence when viewed most favorably to Central discloses that expert testimony was presented which tended to demonstrate that the internal controls Schlitz wanted Central to adopt were unnecessary. There was evidence that a Schlitz representative had indicated that he thought Indiana could be adequately served by eight or ten Schlitz beer wholesalers. There was evidence that Schlitz's wholesaler in Lafayette was

asked if he was interested in expanding his business into additional counties. Finally, there was the letter of June 10, 1972, set out in relevant part, *supra,* from which it can be at least inferred that Schlitz wanted to narrow the scope of its beer operations in Indiana to selected wholesalers.

After having reviewed the lengthy record in the case at bar, we hold that there was sufficient evidence of probative value to support the trial court's Special Findings of Fact No. 44 and 46 and Conclusions of Law No. 5 and 9, that Schlitz's motive in terminating its agreement with Central was pursuant to its plan to consolidate wholesalers in Indiana, and not as contended by Schlitz, because of Central's failure to adopt efficient management controls.

*Issue Seven*

Schlitz argues that the trial court erred in awarding Central $50,000.00 in exemplary damages claiming the award was not supported by sufficient evidence and findings, and the award was excessive.

The recent case of *Vernon Fire & Casualty Insurance Company* v. *Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, outlines the rules which courts in our jurisdiction should follow when called upon to make an award of punitive damages when a party chooses not to perform his contractual obligations. It is still the general rule that an award of punitive damages is improper when a contracting party, without aggravating circumstances, elects for whatever reason not to perform his contractual duties. *Hibschman Pontiac, Inc.* v. *Batchelor* (1976), Ind. App., 340 N.E.2d 377. The reason for the rule is that the injured party in most cases can be made whole by an award of compensatory damages, and the public policy of our State is not offended by the breach of a private contract. However, as our Supreme Court stated in *Vernon, supra,* at p. 180, 181:

"The general rule is not ironclad. Exceptions have developed where the conduct of the breaching party not only

amounts to a breach of the contract, but also *independently* establishes the elements of a common-law tort such as fraud. *Murphy Auto Sales, Inc.* v. *Coomer* (1953), 123 Ind. App. 709, 112 N.E.2d 589. The requirement that an *independent* tort be found serves several purposes. First, it maintains the symmetry of the general rule of not allowing punitive damages in contract actions, because the punitive damages are awarded for the *tort,* not on the contract. Secondly, the independent tort requirement facilitates judicial review of the evidence by limiting the scope of review to a search for the elements of the tort. Neither of these functions of the independence requirement is very compelling when it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort. The foregoing circumstances alone, however, will not sustain the award of punitive damages *It must also appear that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated.* Only when these factors coalesce, will the independent tort requirement be abrogated, and the allowance of punitive damages be sustained. A careful review of the case law in this area leads to the conclusion expressed herein, that an independent tort need not always be established, . . ." (Original emphasis)

Therefore, in order for the award of punitive damages in the case at bar to be sustained it was necessary for Central to prove an independent tort, or conduct which was tortious in nature (bad faith, oppressive conduct, etc.) and that the public interest would be served by the award of punitive damages.

We have carefully examined the record before us and we are unable to say that Schlitz's conduct falls within the well defined parameters of any common law tort. However, we are of the opinion that Schlitz's conduct can be properly characterized as tortious in nature.

We have noted in a previous part of this opinion, Schlitz sought to have its beer wholesalers adopt internal controls. Central chose not to adopt these internal controls and its agreement with Schlitz was thereby terminated. Schlitz had no right to require its wholesalers to adopt these internal con-

trols. See, IC 1971, 7.1-5-9-2 and IC 7.1-3-3-18, *supra.* In *Vernon, supra,* at p. 184 the word "oppressive" was defined as: "An act of cruelty, severity, unlawful exaction, or excessive use of authority." Schlitz's efforts to require Central to adopt its internal controls was an unlawful exaction which was without authority under IC 1971, 7.1-5-9-2 and IC 7.1-3-3-18 *supra,* and amounted to oppressive conduct, tortious in nature, as that term has been defined above.

Also, the trial court found that the true purpose of Schlitz in terminating its agreement with Central was to consolidate the number of Schlitz beer wholesalers in ndiana, and not as contended by Schlitz, because Central had failed to adopt proper management controls. This conduct on the part of Schlitz may properly be viewed as an exhibition of bad faith toward the rights of its wholesalers.

Next, it is necessary for us to determine if the public interest will be fostered by an award of punitive damages.

The public interest, it would always seem, would be fostered by a dynamic, competitive, free market economy where goods and services can be freely traded without the stagnation which could possibly result from outside controls the purpose of which have been found to be to reduce the number of competitors in a given market area, i.e. Indiana. For example, if competition among beer wholesalers should be reduced there would be less impetus upon wholesalers to establish the lowest possible fair price at which to sell their products in order to increase their sales. This could manifest itself in the form of higher prices for the consumer. The public interest would also be fostered by requiring, pursuant to IC 1971, 7-2-1-23 (a) (2), *supra,* that due regard for the equities of the terminated party be considered before the termination becomes final. The trial court found Schlitz had failed to do this. (Special Finding of Fact No. 46, *supra.*) The reasons for this requirement would include, *inter-alia:* (1) when a wholesaler is terminated the unemployment rate would increase with resultant waste in our

human resources, and (2) when a wholesaler is terminated there is going to be some degree of economic waste ensue because of capital expenditures in plant and equipment setting idle.

Therefore, we hold that under the facts of the case at bar there was sufficient evidence to warrant the trial court in awarding Central punitive damages.

Schlitz next argues that the $50,000.00 award of punitive damages is excessive considering that Central was awarded only $1,661.00 compensatory damages.

The award of punitive damages rests within the sound discretion of the trier of fact once it is determined that there is a legal basis upon which to sustain the award. For this court to find an award of punitive damages excessive it must be made to clearly appear that the award is the result of passion or prejudice, and a high ratio of punitive to compensatory damages is not conclusive. *Lou Leventhal Auto Co., Inc.* v. *Munns* (1975), 164 Ind. App. 368, 328 N.E.2d 734. Rather, in reviewing an award of punitive damages upon a claim of excessiveness, we think the purpose of awarding punitive damages must be looked to in order to determine if the award was the result of passion or prejudice. The purpose of an award of punitive damages is to punish the wrongdoer and to deter others from similar conduct in the future. *Capitol Dodge, Inc.* v. *Haley* (1972), 154 Ind. App. 1, 288 N.E.2d 766, 768. Therefore, to properly assess the award of punitive damages, we think such factors as size and earning capacity of the wrongdoer should properly be considered. Schlitz is the second largest brewer in the United States, and its profits total annually in the millions of dollars. Therefore, we are unable to say that the trial court's award of $50,000.00 punitive damages is clearly excessive.

*Issue Eight*

Schlitz argues that the trial court erred in mandating it to continue to perform its agreement with Central until ter-

minated pursuant to IC 1971, 7-2-1-23(a), *supra,* because the agreement is indefinite as to terms and would require extensive court supervision.

This court has already held that the trial court properly found an agreement to exist between Schlitz and Central when the parties' Declaration of Terms is viewed in conjunction with their conduct over the years evidencing their recognition that a valid agreement exists between them. The trial court ordered Schlitz to continue performing under the arrangement which had existed with Central since 1966, and the Lewis-Turner partnership since 1934, until Schlitz terminates the agreement pursuant to IC 1971, 7-2-1-23(a), or until otherwise lawfully terminated pursuant to Indiana law. The terms of Schlitz's and Central's agreement, as evidenced by their Declaration of Terms and course of performance throughout the years were not so indefinite as to require the trial court to abstain from the exercise of its inherent equitable powers in affording a complete remedy to Central. Also, since Schlitz and Central have been conducting their business since 1966 without court intervention, we can find no merit in Schlitz's contention that the enforcement of the trial court's judgment directing Schlitz to continue to perform its agreement with Central until terminated pursuant to IC 1971, 7-2-1-23(a)(2), *supra,* could require protracted court supervision and direction.

We have previously answered Schlitz's argument that the trial court's judgment imposes an invalid burden upon it by requiring it to supervise and make certain that its Indiana wholesalers do not sell their Schlitz beer products to Central's customers. We have previously held that the court's judgment, properly construed, prevents Schlitz only from doing indirectly what it could not do directly. In other words, Schlitz may properly continue to sell its beer to wholesalers throughout Indiana, unless, for example, Schlitz actively assists its wholesalers in attracting Central's customers away from it, thereby violating indirectly the trial court's order that Schlitz continue

its agreement with Central until terminated pursuant to IC 1971, 7-2-1-23 (a) (2), *supra.*

Schlitz argues that the trial court's judgment is inconsistent with IC 1971, 7-2-1-23 (a) (2), *supra.* This statute provides, *inter-alia,* that it shall be unlawful for a brewer to terminate a contract or agreement with a wholesaler "unfairly, without due regard to the equities of such wholesaler . . . and without just cause or provocation . . ."

The judgment of the trial court provided in pertinent part as follows:

"THEREFORE, IT IS CONSIDERED, ORDERED, AD-JUDGED, AND DECREED by the Court that the defendant, Jos. Schlitz Brewing Company, be and it is hereby enjoined and restrained from terminating its agreement and relationship with the plaintiff, Central Beverage Co., Inc., and the defendant, Jos. Schlitz Brewing Company, is hereby ordered to continue to perform according to the agreement of the parties, and to continue to sell Schlitz products to Central Beverage Co., Inc. for wholesale distribution by Central in Delaware County, Indiana, *until such time as the said defendant Schlitz has just cause to terminate said agreement;* or until such time as the parties mutually agree to terminate it; or until such time as the agreement is fairly cancelled or terminated by a party with due regard to the equities of the other party and based upon just cause or provocation as required by law; or until such time as such agreement is otherwise lawfully terminated." (Our emphasis)

Schlitz argues that to be consistent with the statute the trial court's judgment, *supra,* should require it to continue to perform its agreement with Central until such time as it is terminated (1) fairly, or (2) with due regard to the equities of the wholesaler, or (3) with just cause or provocation. We do not agree with Schlitz's interpretation of the statute. On the contrary, we are of the opinion that a brewer cannot lawfully terminate its contract or agreement with a wholesaler unless it is done fairly, with due regards to the equities of the wholesaler, and with just cause or provocation.

Therefore, to the extent that the trial court's judgment allows Schlitz to terminate its agreement with Central *solely* upon a showing of just cause, we remand this case to the trial court with directions to modify this portion of its judgment so that it conforms with the requirements of a valid termination as found in IC 1971, 7-2-1-23 (a) (2), *supra*. When modified, the judgment of the trial court is in all things affirmed.

Robertson, C.J. and Lybrook, J, concur.

NOTE.—Reported at 359 N.E.2d 566.