**GUARANTEE TRUST LIFE INSURANCE COMPANY,**
Appellant–Defendant,

v.

**Catherine PALSCE and David Palsce,**
Appellees–Plaintiffs.

No. 71A03–9311–CV–382.

Court of Appeals of Indiana,
Third District.

Oct. 17, 1994.

Rehearing Denied Jan. 4, 1995.

James H. Pankow, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, for appellant.

James R. Byron, Thorne, Grodnik, Ransel, Duncan, Byron & Hostetler, Elkhart, for appellees.

## OPINION

HOFFMAN, Judge.

Appellant-defendant Guarantee Trust Life Insurance Company (Guarantee) appeals from a judgment granted in favor of appellees-plaintiffs Catherine and David Palsce (Palsce). As extracted in part from *Palsce v. Guarantee Trust Life Ins. Co.* (1992), Ind. App., 588 N.E.2d 525, the facts relevant to this appeal are set forth below.

Catherine Palsce had health insurance at her place of work until she lost her job in 1986. In the fall semester of 1989, David Palsce, her son, brought home a brochure from his school offering a student accident insurance policy offered to the school by Guarantee. According to the brochure, two types of coverage were available, 24–hour coverage or at-school coverage. In bold print on the cover, the brochure stated, "Policy Maximum of $25,000 for Each Accident!" The brochure further explained that this was protection "[w]hen [y]ou need it" and that the 24–hour coverage was the best buy since it covers "away from school and summer vacation accidents." An "Important Notice to Parents" was provided explaining the "policy maximum per accident, for loss resulting directly and independently of all other causes from accidental bodily injury, covered under the Plan" was "$25,000.00."

The brochure then detailed the costs that would be covered for medical expenses and contained many exclusions and limitations.

The bottom of the brochure stated that it was not a contract and that the insurance contract (the master policy) was on file at school. An application for insurance was attached to the brochure. Catherine read the brochure, filled out the application, and sent her $45.00 premium in for 24–hour coverage. She never attempted to read the master policy.

During the summer of 1990, David was involved in an accident causing permanent blindness in his right eye. As a result, he incurred medical bills in the amount of $11,429.97. Catherine filed claims with Guarantee but was informed the policy covered only $1,000.00 for loss to an eye. Guarantee paid $1,099.57 for the medical bills and nothing for the loss of the eye.

Although the brochure had broadly advertised $25,000.00 maximum coverage for accidental loss, the policy severely limited the amount recoverable for specific types of losses. For instance, loss of life was $1,000.00, loss of hand or foot was $2,500.00, loss of both hands, feet, or sight in both eyes was $5,000.00, one hand and one foot was $5,000.00, and either hand or foot and the sight of one eye was $5,000.00. Most importantly, loss of sight in one eye was $1,000.00. None of these "specific" losses were included in the brochure, although it explicitly contained other policy information on medical expenses, excluded losses, and limitations on certain losses.

After a previous appeal resulting in reversal of summary judgment granted in favor of Guarantee, *Palsce*, 588 N.E.2d at 527, and the denial of its second motion for summary judgment, the case proceeded to a jury trial. At the close of evidence, Guarantee asked for but was denied judgment on the evidence. The jury returned a verdict in favor of the Palsces awarding them $25,000.00 in compensatory damages and $25,000.00 in punitive damages. This appeal ensued.

On appeal, Guarantee raises several issues for our review which we consolidate into three:

(1) whether law of the case precluded the Palsces' from prosecuting their fraud claim;

(2) whether there was sufficient evidence of fraud and the damages resulting therefrom; and

(3) whether the trial court erred by allowing an instruction encompassing the Indiana administrative regulations on deceptive advertising by an insurer.

Guarantee contends *Palsce* creates law of the case which precludes the Palsces' claim for fraud. Condensed, Guarantee's argument is that when representations in a promotional brochure act as the contract between the parties, the same language may not also be used as evidence of misrepresentation supporting a fraud claim.

Law of the case is a restriction which precludes re-examination of issues on remand and subsequent appeal which were either expressly or by necessary implication settled as a matter of law on prior review. *Riggs v. Burell* (1993), Ind., 619 N.E.2d 562, 564. The Palsces are correct that the above doctrine does not apply to estop them from bringing a fraud claim. Our reversal of Guarantee's summary judgment was favorable to the Palsces; only those issues which were clearly resolved adversely to Guarantee which it seeks to reassert again on appeal are barred. *Id.*

Also, Guarantee misinterprets *Palsce.* In *Palsce*, the representations in Guarantee's promotional brochure were compared to the master policy. Only after finding Guarantee went to great lengths to place most of the policy provisions into the brochure thus making it appear to Catherine Palsce that those provisions fully corresponded to the contents and coverage of the policy, and also finding she relied on the representations in making her decision to purchase the policy, did we hold that Guarantee could not rely on the more narrow policy exclusions to deny the Palsces the broader coverage represented in the brochure. *Id.* at 527. Although we bound Guarantee by its representations in the brochure treating it as the contract between the parties, our decision in *Palsce* neither expressly nor by necessary implication precluded the Palsces from pursuing their fraud claim.

Unlike contract obligations, tort duties arise by operation of law, not from an agreement between the parties. *Erie Ins. Co. v. Hickman by Smith* (1993), Ind., 622 N.E.2d 515, 519. Thus, although there exists circumstances where a contract can give rise to and support a fraud claim,

> *see e.g. id.* (insurance contract supports claim for breach of duty of good faith);
>
> *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 137 (extensively damaged vehicle repaired and misrepresented as new by dealer to induce sale at full price amounted to fraud supporting punitive damage award);
>
> *F.D. Borkholder Co., Inc. v. Sandock* (1980), 274 Ind. 612, 413 N.E.2d 567, 570–71 (fraud in breach of contract action for construction of concrete block addition); and
>
> *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845, 848 (elements of fraud, malice, gross negligence or oppression found to exist in action for breach of automobile warranty where defendant dealer attempted to avoid making repairs by concealing defects during warranty period),

the two remedies are separate and distinct from each other,

> *see e.g. Kenevan v. Empire Blue Cross & Blue Shield* (S.D.N.Y.1992), 791 F.Supp. 75, 80 (complaint alleging misrepresentation by language in insurer's promotional brochure was independent of breached contract terms and thus could support action for fraud distinct from action for breach of contract); and
>
> *Sparks v. Republic Nat. Life Ins. Co.* (1982) 132 Ariz. 529, 647 P.2d. 1127, 1139 (brochure which was only document examined by insured served as both insurance contract and evidence of insurer's misrepresentation).

Guarantee argues that even if fraud was an available theory at trial, the evidence does not warrant the jury's finding. It contends this being so, the trial court improperly instructed the jury on punitive damages, allowed in evidence of its financial condition, and denied its motion for judgment on the evidence. In a related argument, Guarantee

also complains the trial court erred in allowing the Palsces' instruction encompassing provisions of the Indiana Administrative Code regulations on advertising by insurance companies. *See* 760 I.A.C. § 1–18–1 *et seq.*

The elements of actual fraud are: (1) a material representation of past or existing fact, (2) which is false, (3) made with knowledge or in reckless ignorance of the falsity, (4) is relied upon by the complaining party, and (5) proximately causes injury to the complaining party. *Nestor v. Kapetanovic* (1991), Ind.App., 573 N.E.2d 457, 458. A knowing misstatement of the contents of a writing and of facts which causes a signing of the same is fraud. *A.G. Edwards and Sons, Inc. v. Hilligoss* (1991), Ind.App., 597 N.E.2d 1, 3.

The brochure stated that the master policy would be kept on file at David Palsce's school.[1] However, Guarantee failed to deliver a copy of the policy to either the Palsces, the school, or its agent until after this lawsuit was initiated. Consequently, Catherine Palsce was unable to review the policy and had no oral contact with Guarantee prior to her purchasing coverage. Her only contact with the company was via the representations made to her by Guarantee in the promotional brochure. According to Fred Weeks, a vice president at Guarantee, the sole purpose of the brochure was to solicit policy purchasers and to outline existing coverage.

The evidence further discloses that Catherine Palsce reasonably relied on the brochure representations in deciding to purchase the policy. She stated that she had attempted to purchase other insurance but was unable to because the premiums were too costly. A strong motivation in her decision to purchase Guarantee's policy, however, was the low premium which would, as the brochure stated on a banner on the front, entitle her to a "Policy Maximum, $25,000 for Each Accident!"

Despite this bold representation, Guarantee argues that it was unreasonable for Catherine Palsce to believe a $45.00 premium entitled her to $25,000.00 in coverage in light of the fact that other companies were asking in excess of $600.00 for similar coverage, and that several of the benefits and their amounts were listed on the brochure.

However, the brochure specifically addressed and explained away the low premium stating, "in order to insure continuance of the same low premium thereby bringing benefits within reach of all parents, the policy pays benefits on an excess basis when there is group insurance or automobile medical payment coverage on claims where medical expenses exceeds $100.00." Some benefits were included but under a separate section entitled "PHYSICIAN'S FEE, SURGICAL"; the benefits were based on the California Relative Value Studies [2] and were classified as mere "examples." Further, language at the bottom of the brochure stated, "THIS IS AN ILLUSTRATION—NOT A CONTRACT."

Guarantee paid less than ten percent of the Palsces' medical expenses. As a result, the Palsces were subjected to credit problems and lawsuits from unpaid medical bills. Testimony of Fred Weeks, a vice president at Guarantee, revealed that payment of the maximum benefit of $25,000.00 was available only for the rarest of cases involving such extensive injuries as brain damage, paraplegia, or severe burns. Also, full coverage was saved for only those cases where an extended period of hospitalization was necessary for these types of injuries.

The brochure read, "[p]olicy maximum per accident, for *loss* resulting directly and independently of all other causes from accidental bodily injury, covered under the Plan, $25,-

---

1. Addressing claims forms, the brochure also stated, "[s]implified forms will be furnished through the principal's office (during vacation time, contact the administrators of the plan.)" No forms were provided by Guarantee to the school.

2. The California Relative Value Studies (CRVS), last done in 1960 and published in 1974, is a complex compilation of point values used by physicians in billing and by the insurance industry for use in establishing policy benefits. The CRVS offers information on relationships between costs of various medical procedures. It allots points for various losses which are entered into a formula to arrive at the appropriate benefit.

000.00." (Emphasis added.) Two definitions of loss were supplied, one in the brochure encompassing only medical expenses, and the other was not set forth anywhere in the brochure and was worded narrowly in the benefit rider of the policy. "Loss" under the rider was defined with regard to hands and feet as "actual severance through or above wrists or ankle joints" and more importantly, with regard to eyes as "entire or irrecoverable loss of sight beyond remedy by surgical or other means." Upon the occurrence of any of these dismemberment losses, all other coverage under the policy was to immediately cease.

The series of limitations and discrepancies between the brochure and policy resulted in a situation where recovery of the represented $25,000.00 was nearly impossible. In fact, Weeks was aware of only a couple of cases since the introduction of the policy where the policy maximum had been paid. Moreover, the following colloquy occurred between the Palsces' counsel and Weeks when cross-examined about the language in the brochure:

"Q. Why do something that misleads? Why do something that misleads when it's so unusual that it's ever going to happen anyway?

A. What would you suggest we do?

Q. Well, you're supposed to be answering the questions. But if you want the answer, I would say to tell people that this policy doesn't pay much, because it doesn't does it?

A. Tell people that it doesn't pay much?

Q. Right?

A. On a solicitation brochure?"

■ At trial, the Palsces attempted to further evidence intent to misrepresent the policy by offering an instruction on deceptive and misleading advertising by insurers. As Guarantee correctly notes and as the Palsces do not dispute, the regulations in 760 I.A.C. § 1–18–1 *et seq.*, provide no private cause of action against insurers for deceptive advertising. *Erie*, 622 N.E.2d at 519, n. 1. Nonetheless, we agree with the Palsces that the instruction merely educated the jury concerning an insurer's duty not to deceive or mislead its insured. There was no error here. *See id.* (despite fact that IND.CODE § 27–4–1–4.5 specifying certain "unfair claim settlement practices" provides no private cause of action, supreme court recognized a new cause of action for the tortious breach of an insurer's duty to deal with its insured in good faith).[3]

■ Even if the trial court had committed error in tendering this instruction, any error was harmless. Guarantee's own instruction on the same regulations was also tendered by the trial court. Also, as noted above, the language of the brochure when compared with the limitations and discrepancies of the policy and the testimony at trial, is sufficient in itself to show intent supporting the Palsces' fraud claim. There being fraud, the trial court did not err by denying Guarantee's motion for judgment on the evidence. *See* Ind.Trial Rule 50(A).

Guarantee's contention that punitive damages were not warranted in the present case arises from its improper characterization of the Palsces' claim as sounding only in breach of contract. *See Miller Brewing v. Best Beers* (1993), Ind., 608 N.E.2d 975, 981 (punitive damages not recoverable for breach of contract action standing alone; punitive damages recoverable where an independent tort

---

3. The administrative regulations codified in 760 I.A.C. § 1–18–5 *et seq.* are a series of well-defined guidelines which have been adopted to protect the public against false or misleading advertising by insurance companies. Some are voluntary and others are mandatory.

For example, pursuant to the administrative regulations, an insurer shall not: "exaggerat[e] the policy benefits or minimiz[e] the cost by phraseology which either overstates benefits, or is so incomplete as to leave an exaggerated idea of benefits in the mind of the reader ...," *see* 760 I.A.C. § 1–18–5 (affecting IND.CODE § 27–4–1–4(1)(A) (1993 Ed.)); or use words or phrases which are too complex for anyone not involved in the insurance industry, *see* 760 I.A.C. § 1–18–4 (affecting IND.CODE § 27–4–1–4) (1993 Ed.). Also, the regulations require information in policies and brochures to be set forth conspicuously and in close conjunction with statements to which such information relates, and provide that captions may not minimize, mislead, obscure, or create ambiguity or confusion in their meanings. *See* 760 I.A.C. § 1–18–7 (affecting IND.CODE § 27–1–3–7 (1993 Ed.)).

is also alleged which allows punitive damages). Punitive damages are available if there is clear and convincing evidence that a defendant "acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing ... [and that such damages] will serve to punish the defendant and to deter it and others from like conduct in the future." *Bud Wolf Chevrolet*, 519 N.E.2d at 137–38.

■ When reviewing sufficiency on the issue of punitive damages, this Court neither reweighs the evidence nor determines the credibility of the witnesses. *Erie*, 622 N.E.2d at 521. If, considering only the probative evidence and the reasonable inferences therefrom, we find a reasonable jury could have found the above elements by clear and convincing evidence, the award will be affirmed. *Id.* Already finding fraud above, we must conclude a reasonable jury could have found appropriate its punitive damage award of $25,000.00.[4] By the same token, the trial court was within its discretion in allowing evidence of Guarantee's financial condition. *See Jos. Schlitz Brewing Co. v. Central Beverage* (1977), 172 Ind.App. 81, 105, 359 N.E.2d 566, 581, *trans. denied* (where punitive damages are warranted, evidence of defendant's financial worth is admissible). There being no error, the decision of the trial court is affirmed.

Affirmed.

GARRARD and BAKER, JJ., concur.

---

4. The evidence disclosed that Guarantee had approximately $159,000,000.00 in assets.