**Emma Carolyn WRIGHT and Jackie Wright, Plaintiffs,**

v.

**ST. MARY'S MEDICAL CENTER OF EVANSVILLE, INC., Defendant.**

**No. EV 97–45–C Y/H.**

United States District Court,
S.D. Indiana,
Evansville Division.

June 9, 1999.

---

John C. Whitfield, Madisonville, KY, George E. Stigger, Henderson, KY, for plaintiffs.

Robert H. Hahn, Bamberger Foreman Oswald & Hahn, Evansville, IN, for defendant.

## MEMORANDUM DECISION

YOUNG, District Judge.

The plaintiffs, Emma Carolyn Wright and Jackie Wright, are individuals residing in Kentucky. The defendant, St. Mary's Medical Center of Evansville, Inc., is an Indiana corporation. The court has jurisdiction pursuant to 28 U.S.C. § 1332, and this cause is before the court on the defendant's motion for summary judgment.

### I. Background

Shiley, a wholly owned subsidiary of Pfizer, Inc. ("Pfizer"), produced thousands of

prosthetic Bjork–Shiley convexo/concave ("BSCC") heart valves between 1979 and 1986. The BSCC valve is a "tilting disc valve," in which a carbolitic disc is suspended between an "inlet strut" and an "outlet strut." As the heart beats, the disc tilts into an open position to allow blood to flow through the valve into the adjacent chamber. When the heart slows, the disc returns to a seated position to prevent blood from leaking backwards. Roughly 50,000 of these valves were implanted in patients from all over the world. By 1992, it was estimated that at least 450 BSCC valves had sustained outlet strut fractures, resulting in about 300 deaths.

An outlet strut fracture occurs when the two legs of the outlet strut break off and separate from the "flange" (the ring that encircles the disc of the valve). For a person with a prosthetic heart valve, an outlet strut fracture is catastrophic. When the legs of the strut separate from the flange, the disc escapes from its position and is carried by the bloodstream to other organs in the body. In the absence of a prompt diagnosis and emergency open heart surgery, the consequences are frequently fatal. Sometimes, one leg of the outlet strut separates from the flange, while the other leg remains attached. Following this occurrence—referred to as a "single leg separation"—the disc maintains its position and can function normally for an indefinite length of time. While not dangerous in and of itself, a single leg separation may be a harbinger of the deadly outlet strut fracture.

A class action was initiated against Pfizer in the Southern District of Ohio, wherein it was alleged that the BSCC heart valves were defective. In April 1992, the district judge approved a settlement agreement in the Ohio class action which compensated recipients of BSCC heart valves as follows:

a. A Medical and Psychological Consultation Fund was established to provide claimants with funds to obtain medical and psychological consultation with respect to their heart valves.

b. Settlement class members who undergo valve replacement surgery due to the risk of strut fracture may: 1) receive payment for the expenses of replacement surgery; 2) receive miscellaneous costs and expenses in the sum of $38,000.00; and, 3) receive loss of income up to a maximum of $1,500.00 per week for a specified number of weeks, **if the replacement surgery is in compliance with the guidelines established by the Supervisory Panel.**

c. A claimant may be entitled to valve replacement surgery benefits in those situations where one leg of the strut of the valve has separated from the flange prior to the surgery, even though the replacement surgery did not qualify under the Supervisory Panel Guidelines.

d. If a class member suffers death or disability resulting from a qualifying valve replacement or sustains a strut fracture which results in death or permanent total disability, the fracture claimant is entitled to compensation of: (i) $500,000, (ii) $100,000 to spouse of the fracture claimant, (iii) $100,000 for each minor child, and (iv) the class member's lost income.

e. If the strut fracture does not result in death or permanent total disability, the fracture claimant is entitled to benefits of: (i) $500,000; (ii) $100,000 to spouse of the fracture claimant; (iii) medical expenses; and (iv) lost wages.

(Taken from defendant's brief in support, pp. 19–21. The plaintiffs do not dispute the existence of these facts in their brief in opposition.) (Footnotes omitted.)

The agreement also created a supervisory panel, consisting primarily of recognized scientific and medical experts, to establish protocols and guidelines for heart valve replacement surgery. Pursuant to the settlement agreement, the Bowling–Pfizer supervisory panel established guidelines to assess patients with BSCC heart valves for elective explantation. The guidelines were approved by the United States District Court in the Bowling–Pfizer class action.

One of the class representatives in the Bowling–Pfizer litigation was Emma Carolyn Wright. Ms. Wright, due to rheumatic mitral valve disease, had a defective mitral heart valve replaced in 1983 by a BSCC prosthetic valve, serial number 31 MBRC 16416. In February 1992, Ms. Wright began experiencing chest pain which radiated into her left arm and neck, associated shortness of breath, numbness on the left side of her face, and dizziness. During the same month, she sustained an embolic inferior wall myocardial infarction of the heart. Over the course of the next year, Ms. Wright suffered from reoccurring chest pains and sought treatment for her condition from Dr. Goyal at Trover Clinic in Madisonville, Kentucky. Believing that Ms. Wright might be experiencing problems with her BSCC valve, Dr. Goyal referred her to cardiovascular surgeon John Ansbro at St. Mary's Medical Center in Evansville, Indiana. Following several consultations and a series of tests, Dr. Ansbro suspected that Ms. Wright's prosthetic mitral valve was malfunctioning, causing the formation of micro-emboli (small blood clots) upon the disc of the BSCC valve which could lead to a heart attack or stroke. He recommended the valve's replacement.

On March 8, 1993, Ms. Wright's attorney wrote Dr. Ansbro and indicated the need to retain the original valve following replacement in order to claim possible benefits under the Bowling–Pfizer settlement agreement. Dr. Ansbro forwarded that correspondence to St. Mary's pathology department. The laboratory manager, Robert Florini, discussed plaintiffs' counsel's request with the pathology department chairman, Dr. Robertson, to determine what to do with the valve. Dr. Robertson felt it would be best for all parties involved if St. Mary's retained possession of the heart valve. Dr. Robertson suggested that St. Mary's hold the valve until such time as it was to be evaluated by an independent laboratory to determine whether its condition qualified the Wrights for benefits under the Bowling–Pfizer agreement. Mr. Florini contacted Ms. Wright's attorney, who agreed to that proposal.

Ms. Wright's prosthetic mitral valve was removed by Dr. Ansbro on March 19, 1993, at St. Mary's Medical Center. Following surgery, Mr. Florini received a specimen jar with Ms. Wright's name on the label. Mr. Florini placed the jar, plaintiffs' attorney's letter of March 18, 1993, and a copy of the pathology report in a plastic bag with a "do not discard" label. He placed the bag in a locked file cabinet in his office. Mr. Florini left St. Mary's employment in March 1994. On November 15, 1996, the plaintiffs' attorney directed St. Mary's to mail the valve to class counsel in Cincinnati. On November 22, 1996, Margaret A. Birge, an employee of St. Mary's Medical Center, secured a laboratory bottle that she assumed contained the prosthetic heart valve. The container was labeled with Emma Carolyn Wright's name and hospital identification number. Ms. Birge packaged the container and mailed it. Several days later, St. Mary's was advised by plaintiffs' attorney that the bottle contained only human heart tissue, not the prosthetic heart valve. As a result, pathology department personnel fruitlessly searched St. Mary's storage facilities. According to the parties, the valve remains missing.

On March 24, 1997, the plaintiffs (Emma Wright and her husband, Jackie Wright) brought this action. Count I of the plaintiffs' complaint contends that St Mary's negligently lost Ms. Wright's heart valve. Count II avers that St. Mary's breached a contract to maintain and deliver the valve. Count III asks for punitive damages.

St. Mary's filed a motion for summary judgment as to all three counts, along with accompanying memorandum and exhibits, on October 15, 1998. The Wrights filed a brief in response, along with accompanying exhibits, on November 19, 1998. St.

Mary's filed a reply brief on December 2, 1998. All in all, before the court are: the parties' briefs; the materials from the Bowling–Pfizer litigation; deposition excerpts from Dr. Ansbro, Mr. Florini, Ms. Wright, Mr. Wright, and Raymond Wayne Smith (the claims administrator for the Bowling–Pfizer settlement fund); the parties' answers to interrogatories; Ms. Wright's medical records; and affidavits from Dr. Alan Marty (an expert witness) and Margaret Birge.

## II. Analysis

### A. Summary Judgment Standard

A grant of summary judgment is appropriate when the pleadings and other submissions to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To determine whether a genuine issue of material fact exists, a court must construe the facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the mere existence of "some metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The parties in this action have agreed to most of the facts discussed below concerning the functioning of a BSCC valve, the medical consequences of an outlet strut fracture or single leg separation, and the admissibility of Ms. Wright's medical records. Unless otherwise noted, the facts discussed below have been stipulated to by the parties.

### B. Issues Presented

The court's jurisdiction is premised upon the diversity of the parties' citizenship, and Indiana law provides the rule of decision in this case. The parties agree that Count III of the Wrights' complaint (seeking punitive damages) must be dismissed for want of evidence. However, the parties disagree over the following issues concerning Count I (sounding in negligence) and Count II (sounding in breach of contract). As to Count I, this motion for summary judgment raises issues concerning: (1) the proper standard of care to be applied to St. Mary's; (2) whether the Wrights have submitted evidence that demonstrates a genuine issue of material fact that the standard of care was breached; and (3) whether the Wrights have submitted evidence demonstrating a genuine issue of material fact as to whether they suffered damages as a result of St. Mary's breach. As to Count II, the defendant's motion for summary judgment raises issues concerning whether a genuine issue of material fact exists as to whether the parties had a contract and, if so, whether the plaintiffs have shown that they suffered damages caused by its breach. Because the court concludes that no genuine issue of material fact exists as to the element of causation in Counts I and II, the court finds it unnecessary to address the other issues raised by the parties.

The crux of the plaintiffs' claims is that, due to the defendant's breach of contract and/or breach of duty in tort, they were unable to recover benefits under the Bowling–Pfizer settlement agreement. (*See* Complaint, ¶¶ 4–10). Specifically, in the event that the missing valve would have revealed an outlet strut fracture, Ms. Wright would have been entitled to $500,000, medical expenses, and lost wages; Mr. Wright would have been entitled to $100,000. In the event that the missing valve would have revealed a single leg separation, Ms. Wright would have been entitled to receive: payment for the expenses of

replacement surgery; $38,000 to cover costs and expenses; and loss of income up

to a maximum of $1,500 per week while incapacitated from the surgery.[1]

The plaintiffs' reply brief seems to suggest that the plaintiffs might also be entitled to damages since they cannot pursue an independent product liability claim against Pfizer without Ms. Wright's BSCC valve. Plaintiffs have not articulated the theory upon which such a damage claim would be premised, and at any rate, such a cause of action would apparently be foreclosed by principles of claim preclusion and the terms of the settlement agreement in the Bowling–Pfizer litigation (in which, the court notes, Ms. Wright was not only a class member, but a representative). More importantly, the Wrights' arguments concerning their damages focus exclusively on what they might have recovered under the settlement agreement. Because the plaintiffs have not submitted any evidence suggesting that the valve was of any value to them outside of recovery under the Bowling–Pfizer settlement agreement, the court will consider the failure to recover under the agreement as the extent of the Wrights' compensable damages.

■■■ Causation-in-fact is generally a prerequisite to recovery in both contract, *Fowler v. Campbell*, 612 N.E.2d 596, 601 (Ind.Ct.App.1993); Farnsworth, Farnsworth on Contracts § 12.1, at 148 (1990), and tort, *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 283 (Ind. 1994); *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind.Ct.App.1994). "This element requires, at a minimum, causation in fact— that is, that the harm would not have occurred 'but for' the defendants' conduct." *Daub* at 877. To defeat a motion for summary judgment, the plaintiff must present evidence of probative value based on facts, or inferences to be drawn from the facts, from which a reasonable juror could conclude that, more likely than not, the defendant's wrongful act was a cause in fact of his injury. *See id.* According to these principles, the issue before the court is whether there is a genuine issue of material fact as to if it is probably more true than not true that Ms. Wright's BSCC valve had sustained an outlet strut fracture or a single leg separation. The plaintiffs, however, urge application of two exceptions to the general principles that guide the court's summary judgment analysis. First, they contend that the issue should be "whether Mr. and Ms. Wright would have had the *opportunity* to . . .

1. Though the parties disagree on this point, it appears from the plain language of the settlement agreement that Ms. Wright would have been entitled to these benefits even if she did not qualify under the guidelines for replacement surgery benefits:

    (d) If following a non-qualifying valve replacement without symptoms that have been associated with a fracture it is determined that one leg of the strut of the Settlement Class Member's valve has separated from the flange prior to the surgery, then the valve replacement shall be treated as qualifying under the Panel guidelines including for purposes of electing valve replacement surgery benefits under this agreement
    (Supplemental Agreement of Compromise and Settlement, § 5.2.3.1(d))
    The fact that Ms. Wright had surgery to explant her BSCC valve did not, by itself, entitle her to replacement benefits under the settlement agreement because her risk of strut fracture did not meet the criteria established by the supervisory panel guidelines. The formula for determining a recipient's estimated risk of strut fracture was patient-specific and included the valve degree, the age of implantee at the time of removal, and the manufacturing characteristics of the specific heart valve. The estimated risk of outlet strut fracture for Ms. Wright's heart valve was 0.92% per year. In other words, there was slightly less than a one percent chance that Ms. Wright's BSCC valve would fracture during any given year. Table 1 of the supervisory panel guidelines establishes a threshold fracture rate which a claimant's estimated fracture rate must exceed in order to qualify for explantation benefits. The threshold fracture rate is calculated based on age, gender and valve position, and represents the percentage of risk of outlet strut fracture per year. Ms. Wright's threshold fracture rate was 1.33%. Since Ms. Wright's estimated outlet strut fracture rate of 0.92% was lower than the threshold fracture rate of 1.33%, she would not qualify for explantation benefits under the supervisory panel guidelines unless the procedure subsequently revealed a BSCC valve with a single leg separation.

obtain fracture and explantation benefits under the Bowling–Pfizer settlement agreement...." Second, the Wrights argue that as to this issue, St. Mary's bears the burden of proof because St. Mary's lost the valve. Both issues will be discussed below.

## C. The Burden of Proof

■ The plaintiffs' argument concerning who has the burden of proof seems partially premised upon the fact that, where there is a mutual bailment and the property has been lost or damaged, the plaintiff has a prima facie presumption of negligence and the burden shifts to the defendant. *See Kottlowski v. Bridgestone/Firestone, Inc.,* 670 N.E.2d 78, 84 (Ind.Ct.App. 1996). However, the presumption merely applies to the element of negligence, not the other elements of the cause of action. Moreover, that evidentiary rule does not alter a party's obligation to establish each element of their cause of action by a preponderance of the evidence; the presumption of negligence does not shift the burden of proof to the defendant "but simply the burden of proceeding." *Bottema v. Producers Livestock Ass'n,* 174 Ind.App. 206, 366 N.E.2d 1189, 1193 (1977). The burden of proof on the element of causation thus remains with the plaintiff even if the burden shifts regarding whether the defendant was negligent. *See Holt Ice & Cold–Storage Co. v. Arthur Jordan Co.,* 25 Ind.App. 314, 57 N.E. 575, 575 (1900).

■ The plaintiffs' argument also suggests application of an exception to the general rule that the plaintiff prove their damages with a reasonable degree of certainty. Indiana law requires that damages be relatively certain, but does not require any specific degree of certainty. *Turbines, Inc. v. Thompson,* 684 N.E.2d 254, 258 (Ind.Ct.App.1997). Under this rule, the plaintiff may not recover damages where he cannot establish a reasonable basis in the evidence to support a damage award. *Id.* Damage awards may not be based upon speculation or conjecture. *Id.*

Due to the occasional harshness of this rule, some courts have carved out an exception to the rule such that "[w]here the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty." C. McCormick, Damages § 27, at 101 (1935). *See also, e.g., Smith v. Superior Court,* 151 Cal.App.3d 491, 198 Cal.Rptr. 829 (1984). In such cases, if the difficulty in establishing damages is caused by the defendant, he should bear the risk of uncertainty that his own wrong created. *Smith* at 503, 198 Cal.Rptr. 829. Though neither party has submitted any Indiana authority on this point, at least one Indiana court has applied the rule, *see Lake County Title Co. v. Root Enterprises, Inc.,* 167 Ind.App. 559, 339 N.E.2d 103, 112 n.6 (1975), *rev'd on other grounds* (refusing to consider defendant's contention of failure of proof of contract prices where the difficulty of proof was caused by defendant's breach of contract, and citing McCormick, § 27, *supra*), and the court cannot find any authority suggesting that the rule has been rejected in Indiana.

■ In this case, the defendant's wrongful act caused the difficulty of proof as to whether plaintiffs would have recovered under the settlement agreement "but for" the wrong: if the valve were not lost, the plaintiffs would be able to prove with certainty exactly what their damages (if any) were. The defendant's wrongful act should not be allowed to create a windfall for the defendant by providing the very means by which the defendant can escape liability due to the plaintiffs' resulting failure of proof. But even if Indiana could be said to have adopted an exception to the certainty rule based upon one footnote in a case from 1975, the exception does not relieve the Wrights from proving the element of causation in their prima facie case of negligence and breach of contract. Questions involving certainty of damages go to the quantum of damages, not to the element of proximate cause. In this case, there is uncertainty as to whether the plaintiffs have suffered any damage as a

result of St. Mary's wrongful act. Therefore, the plaintiffs must still carry the burden of proof on the element of causation as part of their prima facie case of negligence.

## D. Loss of a Chance Doctrine

■ A related issue is whether the Wrights are entitled to damages for loss of the *opportunity* to recover under the settlement agreement. The plaintiffs' claim that they are entitled to recovery for such opportunity raises the issue of whether the court should apply the much-debated "loss of a chance" doctrine. Traditional causation principles utilize an *ex post* test which requires courts to contemplate what would have probably happened "but for" the defendant's breach of contract or breach of duty in tort. The "loss of a chance" doctrine, by contrast, is based upon the value of an opportunity itself determined *ex ante*. See Note, *Loss of Chance as Technique: Toeing the Line at Fifty Percent*, 72 Tex. L.Rev. 369, 386 (1993). Some courts have viewed chances as interests worthy of protection in their own right,[2] while others have rejected the theory.[3]

Recovering damages for loss of a chance began in actions for breach of contract,

**2.** See, e.g., Van Gulik v. Resource Development Council for Alaska, Inc., 695 P.2d 1071 (Alaska 1985) (finding that plaintiff was entitled to share grand prize or participate in drawing between two winning tickets with showing that plaintiff would have won or tied if lottery had been properly completed); *Miller v. Allstate Ins. Co.*, 573 So.2d 24, 29 (Fla.Dist.Ct. App.1990) ("It is now an accepted principle of contract law, nonetheless, that recovery will be allowed where a plaintiff has been deprived of an opportunity or chance to gain an award or profit even where damages are uncertain."), *review denied*, 581 So.2d 1307 (Fla.1991); *Wachtel v. National Alfalfa Journal Co.*, 190 Iowa 1293, 176 N.W. 801 (1920) (allowing plaintiff to recover value of chance to win prize, based on value of prizes and reasonable probability of winning one when contest organizer wrongfully canceled contest);*Kansas City, M. & O. Ry. Co. v. Bell*, 197 S.W. 322 (Tex.Ct.App.1917) (noting that plaintiff was entitled only to recover value of chance that his hogs would have won in stock show if delivered on time). *See also* Restatement (Second) of Contracts § 348(3) (1979) (allowing recovery based on conditional right); C. McCormick, Damages § 31, at 122–23 ("[W] here the value of the chance is not outweighed by a countervailing risk of actual loss, and where it is fairly measurable by calculable odds, or by evidence bearing specifically on the probabilities, or by expert opinion, and where the amount of the expected gain is itself fixed or approximately ascertainable, the jury should be allowed to value the lost opportunity."); Wex S. Malone, *Ruminations on Cause–in–Fact*, 9 Stan. L.Rev. 60, 80 (1956) (recognizing that chance can be basis of awarding damages); Elmer J. Schaefer, *Uncertainty and the Law of Damages*, 19 WM. & MARY L. REV. 719 (1978) (proposing that level of certainty be taken into account when awarding damages); Howard R. Feldman, Comment, *Chances as Protected Interests: Recovery for the Loss of a Chance and Increased Risk*, 17 U. Balt. L.Rev. 139 (1987) (arguing that courts should permit recovery for loss of chance).

**3.** *Youst v. Longo*, 43 Cal.3d 64, 233 Cal.Rptr. 294, 729 P.2d 728 (1987) (stating that plaintiff could not recover value of lost prize discounted by probability of winning in absence of interference because outcome of the race was too speculative); *McDonald v. John P. Scripps Newspaper*, 210 Cal.App.3d 100, 257 Cal.Rptr. 473 (1989) (denying recovery to spelling bee contestant who allegedly lost due to contest official's impropriety because plaintiff could not show that he would have won spelling bee otherwise), *modified*, slip. op. (1989); *Alderson v. Miami Beach Kennel Club, Inc.*, 336 So.2d 477 (Fla.Dist.Ct.App.1976) (disallowing damages consisting of anticipated purses which racer might have earned as too speculative to allow recovery); *Jones v. Duff*, 85 A.D.2d 713, 445 N.Y.S.2d 838 (1981) (deciding that plaintiff failed to state claim for relief in action by manager of boxer against promoter and other boxer because it was entirely speculative whether plaintiffs' boxer would have won absent alleged conspiracy); *Friedlander v. National Broadcasting Co.*, 39 Misc.2d 612, 241 N.Y.S.2d 477 (1963) (allowing plaintiff's cause of action for amounts actually won but denying claim for $100,000 for winnings plaintiff allegedly would have won as too speculative), *rev'd on other grounds*, 20 A.D.2d 701, 246 N.Y.S.2d 889 (1964); *Phillips v. Pantages Theatre Co.*, 163 Wash. 303, 300 P. 1048 (1931) (denying plaintiff's claim for damages as overly speculative where contest promoters denied plaintiff the opportunity to appear in final round of contest); *Collatz v. Fox Wisc. Amusement Corp.*, 239 Wis. 156, 300 N.W. 162 (1941) (reversing lower court's award to plaintiff of half the value of prize when prize wrongfully awarded

where a plaintiff could not prove damages with certainty but could prove that he lost the opportunity to participate in some event, such as a contest, about which the outcome was uncertain, but which might have resulted in the plaintiff's financial benefit. More recently, the "loss of a chance" doctrine has reappeared in tort cases—medical malpractice cases where it was probable that the plaintiff would have died even absent a

health provider's negligence.[4] However, other courts have rejected the doctrine in the medical malpractice context.[5]

The issue of whether the loss of a chance is compensable in Indiana has only been addressed in the medical malpractice context. *Mayhue v. Sparkman,* 653 N.E.2d 1384 (Ind.1995). In *Mayhue,* the Indiana Supreme Court, reversing the Court of Appeals, rejected the lost chance doctrine in the medical malpractice setting in favor of the "Restatement approach," which does not recognize chances of being worthy of protection in their own right. *Id.* at 1388 (quoting Restatement (Second) Torts § 323 (1965)).

▮ Given that the Indiana Supreme Court rejected the lost chance doctrine in

---

to other contestant because it could not be proven that if contest had been properly completed, plaintiff would have emerged the winner).

4. *See, e.g., O'Brien v. Stover,* 443 F.2d 1013, 1018 (8th Cir.1971) (ruling that evidence indicating that the patient had a 30% chance of survival absent the defendant's negligence is sufficient to create a jury issue); *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 688 P.2d 605, 615–16 (1984) (allowing plaintiffs with a not-better-than-even chance to recover damages based on proof of increased risk);*Roberson v. Counselman,* 235 Kan. 1006, 686 P.2d 149, 160 (1984) (holding, in light of evidence that the plaintiff had a 40% chance of surviving a heart attack with proper treatment, that "[w]hether the negligence of defendant was a substantial factor in Mr. Roberson's death is a matter for determination by a jury upon due consideration of all related factors"); *Aasheim v. Humberger,* 215 Mont. 127, 695 P.2d 824, 828 (1985) (finding that the "trier of fact should determine whether defendant's negligence was a substantial factor in reducing plaintiff's chances of obtaining a better result"); *Kallenberg v. Beth Israel Hospital,* 45 A.D.2d 177, 179, 357 N.Y.S.2d 508 (1974) (holding that a 20–40% chance was sufficient to create a jury question on the proximate cause of the plaintiff's death), *aff'd,* 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975); *Thornton v. CAMC, Etc.,* 172 W.Va. 360, 305 S.E.2d 316, 325 (1983) (holding that a defendant may be liable if the plaintiff shows that the defendant's acts or omissions increased the risk of harm and that the increased risk "was a substantial factor in bringing about the ultimate injury to the plaintiff").

5. *See, e.g., Alfonso v. Lund,* 783 F.2d 958, 964–65 (10th Cir.1986) (holding that under

New Mexico law a plaintiff could not establish a jury question where evidence showed only a possibility that the patient's severed fingers could have been saved given adequate medical care); *Grody v. Tulin,* 170 Conn. 443, 365 A.2d 1076, 1080 (1976) (holding that an expert's testimony—that it was "within the realm of possibility" that an operation would have prolonged the plaintiff's life—was insufficient "to remove the theory from the realm of speculation"); *Gooding v. University Hosp. Bldg., Inc.,* 445 So.2d 1015, 1019 (Fla.1984) ("We cannot approve the substitution of such an obvious inequity for a perceived one."); *Manning v. Twin Falls Clinic & Hosp., Inc.,* 122 Idaho 47, 830 P.2d 1185, 1190 (1992) (rejecting the loss of chance doctrine and holding that "the 'substantial factor' standard of proof for proximate causation strikes a fair balance between the claimant and the defense"); *Cornfeldt v. Tongen,* 295 N.W.2d 638, 640 (Minn.1980) ("[T]o avoid a directed verdict a plaintiff must introduce expert medical testimony that it was more probable than not that the death resulted from the doctor's negligence."); *Clayton v. Thompson,* 475 So.2d 439, 445 (Miss.1985) ("Mississippi law does not permit recovery of damages because of mere diminishment of the 'chance of recovery.' "); *Pillsbury–Flood v. Portsmouth Hosp.,* 128 N.H. 299, 512 A.2d 1126, 1130 (1986) (refusing to shift the burden of proof to defendants in these cases);*Cooper v. Sisters of Charity,* 27 Ohio St.2d 242, 272 N.E.2d 97, 104 (1971) ("[Expert] opinion that, with surgical intervention, decedent's expectation of survival was '[m]aybe . . . around 50%,' in our judgment does not provide a basis from which probability can reasonably be inferred."); *Sherer v. James,* 290 S.C. 404, 351 S.E.2d 148, 150–51 (1986) (refusing to relax the plaintiff's burden of proving proximate cause in a medical malpractice case).

the medical malpractice setting, it is unlikely that they would recognize it in the case before us. First, the court's conclusion in *Mayhue*—that "[a]ccepting the § 323 approach does not require a separate loss of chance doctrine"—indicates a reluctance to carve out a new doctrine of recovery for plaintiffs in this area. *Id.* Secondly, recognition of a loss of chance doctrine is more compelling where the law is compensating the loss of a chance at life, rather than the loss of a chance at, as here, some purely economic gain. *See, e.g., James v. U.S.*, 483 F.Supp. 581, 587 (N.D.Cal.1980) ("No matter how small that chance may have been ... no one can say that the chance of prolonging one's life ... is valueless."); *Daugert v. Pappas*, 104 Wash.2d 254, 704 P.2d 600 (1985) (rejecting loss of a chance in legal malpractice case on grounds that while the loss of chance to recover from misdiagnosis of cancer resulted in a very real injury with definite value which would require compensation, there is no commensurate harm, no lost chance, in a legal malpractice case as the matter may eventually be reviewed).

The plaintiffs' claim for breach of contract does not present a better case than their tort claim for application of the "loss of a chance" doctrine. Although the doctrine arose in the breach of contract setting (*see* Note 2, *supra*, for early cases), Indiana had apparently not adopted the doctrine in a breach of contract case. Given the Indiana Supreme Court's reluctance to recognize the doctrine in tort, it is unlikely that they would do so to remedy a breach of contract. There is less basis for denying recovery for loss of a chance in tort cases since: (1) unlike contract cases, the contemplation of the parties is immaterial, *see Note and Comment, The Rule of Certainty in Damages and the Value of a Chance*, 10 Mich. L.Rev. 392, 394 (1911); and (2) tort cases seek to deter negligent conduct, *see Roberson v. Counselman*, 235 Kan. 1006, 686 P.2d 149, 160 (1984) (stating the failure to recognize the loss of a chance at life in tort "in essence, declares open season on critically ill or injured per-

sons as care providers would be free of liability for even the grossest malpractice if the patient had only a fifty-fifty chance of surviving ... with the proper treatment"); *Thompson v. Sun City Community Hosp.*, 141 Ariz. 597, 688 P.2d 605, 615 (1984) (noting that a refusal to allow any recovery for critically ill plaintiffs "tends to defeat one of the primary functions of the tort system—deterrence of negligent conduct because cases based on statistical possibilities [cannot yield recovery] even though it may be statistically irrefutable that some have been injured").

Because Indiana law has not recognized the loss of an opportunity as damages in a negligence or breach of contract action, and because the Indiana Supreme Court has explicitly rejected the doctrine in medical malpractice situations, the court finds that the doctrine is unavailable in Indiana. If Ms. Wright's heart valve revealed, upon laboratory analysis, that it contained an outlet strut fracture, she would have been entitled to $500,000 (and Mr. Wright would have received $100,000) under the terms of the Bowling–Pfizer settlement agreement. If Ms. Wright's valve contained a single leg separation, she would have received $38,000, medical expenses, and lost wages. If subsequent laboratory analysis would have revealed neither of these things, Ms. Wright would have recovered nothing. As discussed above, the plaintiffs must carry the burden of proof that, but for the defendant's breach of contract or breach of duty in tort, they would not have suffered the damages that they seek.

Having slogged through these preliminary questions, the court now turns to the heart of this matter (no pun intended): whether the Wrights have submitted evidence of causation to create a genuine issue of material fact.

## E. Evidence of Causation

The parties have tendered excerpts from Ms. Wright's medical records to support their positions, which the court has re-

viewed in some detail and attaches to this opinion as Appendix I. Most of the parties' disagreement about the weight of the evidence concerns the significance of certain medical records and testimony of Ms. Wright's surgeon, Dr. Ansbro. Dr. Ansbro admitted Ms. Wright to St. Mary's Medical Center on March 18, 1993. In his History and Physical, Dr. Ansbro noted that the transesophageal echocardiogram performed by Dr. Harrison showed the mitral valve "was well-seated without any rocking motion. The leaflet mobility was entirely normal." Dr. Ansbro's impression was: "1) Mitral valve dysfunction with highly mobile platelet aggregates/red cell rouleau evident on echo" and "2) History of myocardial infarction and TIA's." The following day, Dr. Ansbro replaced the BSCC mitral valve with a St. Jude prosthetic valve. Dr. Ansbro's pre- and post-operative diagnoses were: "Suspected microemboli from prosthetic mitral valve."

On discharge, Dr. Ansbro summarized his rationale for replacing the BSCC heart valve:

This is a 42 year old coronary care unit nurse from Madisonville, Kentucky who, in September 1983, underwent a Bjork–Shiley mitral valve replacement for rheumatic mitral valve disease. Recently, the patient has had episodes of recurring angina as well as transient ischemic attack symptoms, through [sic] to be secondary to peripheral embolic events from the prosthetic mitral valve. The echocardiogram suggested some sludging of blood elements about the mitral valve. Because of these recurring episodes, plus the known complication rate with this type of valve, mitral valve replacement was proposed to and accepted by the patient and she is admitted at this time for that procedure.

Dr. Ansbro further noted in this discharge summary that at the time of explantation of the BSCC heart valve, the valve "appeared to open and close properly." On March 19, 1993, St. Mary's pathologist, Thomas Kandul, M.D., also analyzed the explanted heart valve and noted "[n]o obvi-

ous abnormalities" and that "the valve leaflet opens and shuts easily."

Dr. Ansbro's recommendation to remove the valve was premised primarily upon the thromboembolisms, and also concern that Ms. Wright's valve might sustain a fracture at some point in the future. (Ansbro Dep., pp. 16, 23). However, he did not suspect that Ms. Wright's valve might have already sustained a fracture. *Id.* Dr. Ansbro testified that the threat of thromboembolism from Ms. Wright's Bjork–Shiley mitral valve was a phenomenon that occurs in all prosthetic heart valves regardless of the identity of the manufacturer. The plaintiffs have not submitted any evidence that suggests a link between thromboembolism and the probability of a strut fracture. Nevertheless, the plaintiffs point to several pieces of evidence which, they contend, establish a material fact as to whether Ms. Wright may have sustained an outlet strut fracture or single leg separation.

First, the plaintiffs argue that hospital reports reveal that Ms. Wright experienced significant medical problems stemming from her mitral valve. Undoubtedly, she did. However, the "medical problems" referred to in the reports all concern microemboli and thromboembolisms rather than the problems associated with an outlet strut fracture or single leg separation. The plaintiffs admit that thromboembolisms occur in all brands of valves and do not entitle a claimant to recovery under the settlement agreement.

Second, the Wrights point out that Dr. Ansbro's reports are replete with notes concerning the valve's "dysfunction." However, Dr. Ansbro's deposition reveals that his use of the word "dysfunction" referred to the formation of micro-emboli rather than the possibility of an outlet strut fracture or single leg separation. Dr. Ansbro said that "[t]he mitral valve itself was dysfunctional in the sense that it was allowing blood to form micro-emboli

on the surface of the valve."[6] (Ansbro Dep., pp. 54–55).

Thus, Dr. Ansbro's testimony reveals nothing more than that Ms. Wright was suspected of having blood clots on the disc of her valve. The testimony does not establish any link from which a reasonable inference could be drawn that the clots were related to a strut fracture. In fact, Dr. Ansbro said that the complication was "true of any valve."

Third, the plaintiffs point to Dr. Ansbro's deposition testimony that the valve "could have had a micro-fracture of some sort." When understood in its proper context, however, that remark is not probative of whether Ms. Wright's valve sustained a single leg separation or outlet strut fracture. Dr. Ansbro indicated that micro stress fractures cannot be seen by the naked eye, and a microscope needs to be utilized in order to see these fractures. (Ansbro Dep., p. 19). He testified that without analysis by a microscope, there was no way of telling whether Ms. Wright might have had a micro-fracture. (Ansbro Dep., p. 54). However, Dr. Ansbro's testimony establishes that he did not suspect a fracture. (Ansbro Dep., p 51). Moreover, Dr. Ansbro distinguished between a

micro-fracture and the sorts of fracture that would entitle Ms. Wright to benefits under the settlement agreement:

Fractures—obviously, if the strut breaks off completely, the fracture is obvious and you can see that with the naked eye. The concern is then, however, to remove these valves before the catastrophic—catastrophic event occurs. And people have been trying to look at, use special x-rays to look at the struts of the valve to see whether they can pick up little micro stress fractures and then predict because of that the valve is more prone to break away, for the fracture to occur.

(Ansbro Dep., p. 17). Dr. Ansbro's distinction is reinforced by the testimony of Raymond Smith (the claims administrator for the Bowling–Pfizer settlement fund) who

---

6. Other portions of Dr. Ansbro's deposition are instructive of the valve's suspected problems:

Q: And can you tell us what your concerns were the first time you saw Carolyn Wright?
A: I was concerned that she was emoblizing, meaning that she was forming little clots or aggregates of bloods of the valve itself which were breaking loose as the blood traveled across the valve. And of course, the fragments of blood will travel with the bloodstream to wherever it may be going. It can go to the brain. It can go to the kidneys. It can go to the stomach and the legs or, in her case, I was concerned they were going to the heart itself because she was having changes on her cardiogram and also some symptoms suggestive of a problem with the coronary arteries.
Q: Doctor, at the time that you made this diagnosis, was there some concern about the clots coming off the valve?
A: Yeah, I thought she might be prone, even though she was anti-coagulated, to have aggregates of platelets, which are very small formed elements within the blood responsible for clotting in all of us, which might be forming and breaking loose.
(Ansbro Dep., pp. 7–8).
Q: At the time you made this diagnosis, did you have any reason for why the valve would be having clots on it like this?

A: No, I had no reason why that particular valve should be forming clots, except that any surgeon is with a prosthetic valve, regardless of the type of prosthetic valve, is aware that it can malfunction and it can form clots. I mean, these are foreign objects—they were foreign substances in the bloodstream, and they have to protect it by Coumadin, for example.

\*    \*    \*    \*    \*    \*

Q: A clot formation on the valve, and in particular this Bjork–Shiley valve that Carolyn Wright had, is this formation a typical by-product of having a valve like this or—
A: No, I think it's atypical. I mean, it's certainly reportable, it certainly has been known to happen, but I think it's atypical. If you look at a hundred people who have a Bjork–Shiley valve in place, how many would form microemboli or micro clots on the valve. One or two perhaps. Not a lot. That's true of any valve.
Q: Okay. So that was your concern, though?
A: My concern is that she was having embolic events from the valve, yeah.
Q: And that was atypical?
A: Atypical, with that—with anti-coagulants.
(Ansbro Dep., pp. 9–10).

stated that a "single leg separation," for purposes of settling claims, is "where one leg of the outlet strut fractures and separates from the flange." (Smith Dep., p. 15). Thus, a "single leg separation" does not include "micro" or "stress" fractures which cannot be seen by the naked eye because a single leg separation, by definition, includes a complete separation of the leg from the flange.

A review of Ms. Wright's admission history, operative report and discharge summary by Dr. Ansbro for her admission of March 18, 1993, establishes that there is no evidence that Ms. Wright sustained an outlet strut fracture prior to the explantation on March 19, 1993. This conclusion is based on the fact that when an outlet strut fracture occurs, the disc escapes and the valve can no longer open or close. The hospital records of the surgeon who removed the valve and the pathologist who inspected it post-operatively establish that Ms. Wright's valve opened and closed properly. As pointed out in Mr. Smith's deposition, if an outlet strut fracture had occurred, there would no longer be a disc attached to the rest of the valve to inspect. Dr. Ansbro carefully inspected the BSCC mitral valve when he removed it, and did not see any abnormalities at the location where the outlet strut was welded to the circular ring.

During the 13–month period prior to March 19, 1993, Mrs. Wright's cardiac catheterizations, echocardiograms, transesophageal echocardiograms, radiographic studies and clinical examinations did not reveal any evidence of an outlet strut fracture or a single leg separation of the outlet strut.

According to Dr. Marty, the clinical symptoms of an outlet strut fracture of a prosthetic Bjork–Shiley mitral heart valve are: (i) complaints of the sudden onset of rapidly progressive dyspnea; (ii) extreme chest pain; (iii) impairment or loss of consciousness or cardiac arrhythmia; and (iv) change in or absence of normal prosthetic valve sounds. Physical examination will reveal hypotension, shock and severe pulmonary edema. In the absence of prompt remedial heart surgery, the consequences of an outlet strut fracture of a prosthetic heart valve is the death of the patient. There is no evidence in any of Mrs. Wright's medical or hospital records of the clinical manifestations or findings on physical examination of an outlet strut fracture of her prosthetic mitral valve.

According to Dr. Marty, who reviewed Ms. Wright's medical records, the percentage of probability that there was a single leg separation of the outlet strut of the prosthetic valve was "substantially less" than ten percent. Neither Ms. Wright's medical records, nor the testimony of Dr. Ansbro, reveal any reason to conclude that Ms. Wright probably had a single leg separation or an outlet strut fracture.

Resolving all factual disputes and reasonable inferences in favor of the plaintiff, the possibility that Ms. Wright suffered a single leg separation or outlet strut fracture remains remote, at best. The Wrights have not submitted any evidence which suggests that, more probably than not, they would have recovered under the settlement agreement absent St. Mary's negligence or breach of contract.

### III. Conclusion

Having found no evidence to create a genuine issue of material fact as to the element of causation in the plaintiffs' claims, the court must grant summary judgment for the defendant. In reaching this conclusion, the court is not without sympathy for Mr. and Ms. Wright. Because the valve is missing, it is impossible to say with certainty what a laboratory analysis would have revealed. When St. Mary's lost the valve (as the court will assume it had, for purposes of resolving this motion), the loss deprived the plaintiffs of a gambler's chance at a large jackpot. Although many Hoosiers undoubtedly value such chances (consider, for example, the popu-

larity of riverboat casinos), under Indiana law they are not currently compensable.

For the forgoing reasons, the court hereby **GRANTS** the defendant's motion for summary judgment and **ORDERS** that judgment be entered in favor of the defendant, St. Mary's Medical Center of Evansville, Inc.